# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 7, 2004        Decided March 11, 2005

No. 03-3141

UNITED STATES OF AMERICA,
APPELLEE

v.

JAMES H. YARBOROUGH,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(03cr00070-01)

———

*Sandra G. Roland*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A. J. Kramer*, Federal Public Defender. *Neil H. Jaffee* and *Shawn Moore*, Assistant Federal Public Defenders, entered appearances.

*John P. Mannarino*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Kenneth L. Wainstein*, U.S. Attorney, and *John R. Fisher* and *Roy W. McLeese, III*, Assistant U.S. Attorneys.

Before: EDWARDS, SENTELLE, and RANDOLPH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*: James Yarborough appeals his conviction, after a jury trial, for illegally possessing a firearm as a convicted felon. Yarborough argues that his conviction was the product of coercion resulting both from the district judge's *ex parte* and allegedly intrusive interchanges with the jury, and from the judge's delivery of a nonstandard anti-deadlock charge.

On a winter night in January 2003, the police received a report about gunshots coming from a fenced field adjacent to a junior high school. Two uniformed officers drove their squad car to the scene. When they arrived they saw a man, later identified as Yarborough, standing in the field, holding a chrome pistol in his right hand. Yarborough spotted the officers and bolted. As they gave chase, at least one of the officers kept Yarborough in sight until he ducked into a small courtyard. When he emerged a minute later, unarmed, the police arrested him. A later search of the courtyard uncovered a chrome pistol. Forensic analysis matched the pistol to a shell casing found in the field where the police first spotted Yarborough. The grand jury charged Yarborough with possession of a firearm and ammunition by a person who had been convicted of a crime punishable by imprisonment for one year or more. 18 U.S.C. § 922(g)(1).

Yarborough's trial began on July 30, 2003. The presentation of evidence took less than four hours and consisted almost entirely of testimony from the two arresting officers. About ninety minutes after deliberations began, the jurors sent out a note requesting transcripts of the officers' testimony. The judge suggested to counsel that rather than bringing the jury back into the courtroom, it might be more expedient for him to go to the jury room and inform the jurors in person that transcripts could not be provided. Counsel for both sides

consented.

When the judge returned a short time later, he informed counsel on the record that the jurors had asked him two additional questions. One juror wanted to know what would happen if they were unable to decide on a verdict, to which the judge replied: "I'm not going to respond to that. I don't even want to think about that. I want you to deliberate with a view toward reaching a verdict." Another juror wanted clarification of the instructions regarding the legal definition of possession because she found the original explanation "a little fuzzy." The judge replied, "I can report to counsel that you have some questions about the possession instruction, but I am not going to elaborate on it without consulting with them." When another juror began to say something, the judge walked out the door, telling the jurors "you are now deliberating." Neither the defense nor the prosecution objected when the judge told them of these exchanges. Later that day, the jury sent another note stating, "We are stuck. We would like to continue tomorrow morning." It is not clear whether the judge informed counsel of this note. Deliberations then adjourned until the next day.

On the morning of July 31, the judge notified counsel for the government and the defense of another exchange he had with the jurors. The judge explained that when he went to the jurors' room to release them for the day, the foreperson asked the judge if he would "answer the question I asked about possession." The judge replied that he was not sure, that he would have to consult with the attorneys, that the jurors should read the official instruction and continue to deliberate, and that if they continued to have a problem with the instruction they should make this known in a note.

After further deliberations on the morning of July 31, the jury sent out a new note: "We are at a standstill. We have not

been able to make any new progress. What do we do next?" The judge brought the jury out, and inquired of the foreperson: "[I]s a reason why you are not able to make any new progress continuing confusion or disagreement about the instructions?" The foreperson answered "No." The judge again asked, "You think you got the instructions down; is that correct?" The foreperson replied, "Yes." The judge then released the jury for lunch, informing them that he would instruct them further upon their return.

After the jurors departed, the court told counsel that he intended to deliver either an "*Allen*" (*Allen v. United States*, 164 U.S. 492 (1896)) anti-deadlock charge, as refined by *United States v. Thomas*, 449 F.2d 1177, 1187 (D.C. Cir. 1971) (en banc), or a different formulation recommended by the Council for Court Excellence, a nonprofit organization devoted to promoting judicial reform in the Washington, D.C. area. When the jury reconvened, the judge opted for the latter, rejecting the *Thomas* charge as "watered down" and "kind of useless." Defense counsel objected, requesting the *Thomas* charge instead. The judge then delivered the following instruction, reproduced in its entirety:

> You've indicated to me that you're having trouble reaching a unanimous verdict. I think the record should reflect that you have now been deliberating for a longer period of time than it took you to hear the evidence in the case. I'm very mindful of that.

> My responsibility is to do whatever I can to assist you in the work you're doing, but I have another very important responsibility, and that is not to coerce, pressure, push, or lean on you in any way at all. You are the only judges of the facts, and you will remain the only judges of the facts.

You have very carefully not mentioned to me or to anyone, as far as I know, how you are divided. And that's exactly appropriate, and I appreciate your maintaining that degree of secrecy. I have no idea how you're divided. I don't want to know it until or unless you reach a unanimous verdict.

I am not interested in forcing a decision here. What I am interested in is offering to help you, if you think I can help you, and when I say if I can help you, I may enlist the assistance of the lawyers here.

What I'm proposing is that it may be helpful for you in the privacy of the jury room -- and we have to do this very privately and formally -- to -- if you haven't already done this, to carefully identify where you agree and where you disagree, and then discuss how the law and the evidence affect those issues; and then if you still have agreement -- if you still have disagreement, what might be useful is for you to identify for me any questions you have about the evidence or the instructions for which you would like to have assistance from the Court or from the lawyers.

If you choose this option -- and I do not insist that you do -- but if you choose this option, then write down as clearly and simply as you can where some further assistance might help you in reaching a verdict.

I'm repeating myself much too much, but I have to make very, very clear that I have no wish or intention to force a verdict from you, and neither do I -- neither am I asking you to stay in that jury room forever.

If you consider what I have to say and quickly conclude that this is not going to be of any help, then write a note about

that, and tell me that it's not going to be of any help.

But if you think it will be of help, then tell me as soon as you care to whether and how the Court can help you to reach a unanimous verdict.

And with that, I'm going to ask you to go back and consider what I've just said. And thank you very much.

The jury resumed deliberations and soon delivered a note requesting clarification of the law on possession and constructive possession. After consulting both attorneys, and hearing no objection from either, the judge responded to these queries. Less than an hour later, the jury returned a verdict of guilty.

Although the focus of Yarborough's appeal is on the Council for Court Excellence charge, he also faults the judge's *ex parte* conversation with the deliberating jurors, and the judge's questioning of the jury foreperson, in open court, regarding possible reasons for the deadlock. Yarborough's trial attorney did not object to either incident. Plain error is therefore the standard of review. *United States v. Lancaster*, 968 F.2d 1250, 1254 (D.C. Cir. 1992). While the judge's conduct may have been irregular and otherwise fraught with the potential for jury coercion, the record discloses no indication that coercion actually resulted, much less a "high probability that the judge's conduct adversely affected the defendant." *Spann v. United States*, 997 F.2d 1513, 1518 (D.C. Cir. 1993). Neither incident therefore provides an independent ground for reversal, but both have some bearing on the anti-deadlock instruction, to which defense counsel did object.

In deciding *Allen* more than a century ago, the Supreme Court recognized the authority of trial judges to encourage

deadlocked jurors to reexamine their positions and engage in further deliberation. The exercise of this judicial prerogative is limited by the principle that a "criminal defendant being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfeld v. Phelps*, 484 U.S. 231, 241 (1988). Accordingly, "[a]ny undue intrusion by the trial judge into this exclusive province of the jury is error of the first magnitude." *Thomas*, 449 F.2d at 1181. This tension became the subject of countless criminal appeals. Nearly every time a trial judge gave one version or another of an *Allen* charge, and the formerly deadlocked jury returned a verdict of guilty, the defendant was able to mount at least a colorable claim of coercion. More than three decades ago, in an effort to stem this tide, this court, sitting *en banc*, exercised its supervisory power and adopted the standardized *Allen* charge now reprinted in the Criminal Jury Instructions for the District of Columbia (the "Redbook"), Instruction 2.91, Alternative "A" (4th ed.). *Thomas*, 449 F.2d at 1187. The goal was to put an end to the "uncertainties of gauging various *Allen*-type renditions in terms of the coerciveness of their impact." *Id.* at 1186. "When each judge freely devises his or her own variations on the same theme, this causes a 'drain on appellate resources' as the 'inevitable aberrations' inevitably precipitate more and more appeals." *United States v. Berroa*, 46 F.3d 1195, 1198 (D.C. Cir. 1995) (quoting *Thomas*, 449 F.2d at 1184, 1185).

In the years since *Thomas*, we consistently have "refused to crack open the Pandora's box *Thomas* nailed shut." *Berroa*, 46 F.3d at 1197. Any substantial departure from the language approved in *Thomas* is "presumptively coercive." *Id.* at 1198. The trial judge's departure here was substantial, and intentionally so. The government does not argue otherwise. It defends the conviction on the ground that the instruction was phrased as an offer of assistance to the jurors rather than an exhortation for them to reexamine their views. As the

government sees it, the instruction therefore was not subject to the strictures of *Thomas*. We decline the government's invitation to elevate form over function. The judge delivered the charge as a last-ditch effort to break the jury's deadlock, and as a direct substitute for the standard instruction *Thomas* required. The instruction acknowledged the jurors' disagreement; stated that the judge did not know how they were divided and did not want to know "until or unless you reach a unanimous verdict"; told the jurors to "identify where you agree and where you disagree, and then discuss how the law and the evidence affects those issues"; and then, if the disagreement persisted, told them to consider identifying for the judge "any questions you have about the evidence or the instructions for which you would like to have assistance from the Court or from the lawyers."

The government also suggests that our decision in *United States v. Ayeni*, 374 F.3d 1313 (D.C. Cir. 2004), implicitly endorsed the charge at issue here. In that case, we reversed a conviction that resulted after the court delivered the Council for Court Excellence charge, received questions from the jury relating to the evidence, and then permitted counsel to make supplemental closing arguments in response to the jury's questions. The charge itself was not a ground for appeal in *Ayeni*, and we did not consider its legitimacy. Today we do, and we reject it as an acceptable model for use in this circuit.

The Council for Court Excellence charge openly invites an intrusion into the basic functions of the jury and does so in a manner that is rife with the potential for coercion. The charge is copied from one in Arizona, adopted in 1995 for use in the state's courts. *See* COUNCIL FOR COURT EXCELLENCE, JURIES FOR THE YEAR 2000 AND BEYOND: PROPOSALS TO IMPROVE THE JURY SYSTEMS IN WASHINGTON, D.C. 70 & n.95 (1998); *see also* ARIZ. R. CRIM. P. 22.4. The Arizona model expressly contemplates an "invitation to dialogue" extending beyond

purely legal questions and elicits the jury's factual and evidentiary concerns, in response to which a court may "direct[] the attorneys to make additional closing argument [or] reopen[] the evidence for limited purposes." ARIZ. R. CRIM. P. 22.4 cmt. Such an approach oversteps the bounds of a federal court's proper role when presiding over a jury trial. The function of a federal trial judge is to be an arbiter of law, not a trier of fact. The importance of this distinction has been recognized throughout the federal judiciary, *see Ayeni*, 374 F.3d at 1320-21 (Tatel, J., concurring) (enumerating holdings of multiple circuits), and government counsel conceded at oral argument that the Arizona procedure of interposing the trial judge in the jury's deliberative process is inconsistent with the law of this circuit, *see also id.* at 1316-17. The government responds that in this case, the jury did not ask any factual questions and did not disclose its views of the facts after receiving the instruction. No one but the jurors knows why. The pre-lunch exchange between the judge and the foreperson indicated that the division among the jurors did not stem from the instructions. That suggests that the hangup was over the evidence. One possible explanation for the jury's failure to take up the judge's invitation is that a holdout juror did not want his view of the evidence exposed in open court. All we can be sure of is that when a court invites jurors to "identify for me any questions you have about the evidence," it is asking a question whose answer is impermissible. It follows that the question itself is impermissible.

Because coercive effects never can be proven with certainty, the issue becomes whether the instruction had "a substantial propensity for prying individual jurors from beliefs they honestly have." *Thomas,* 449 F.2d at 1182. Here, the judge preceded his "invitation to dialogue" with his observation that the jury had been deliberating for a longer period of time than it had taken to hear the evidence. The jurors could have taken the

remark as a rebuke for engaging in excessively drawn out deliberations. In addition, the judge had entered the jury room on two separate occasions without counsel or a court reporter present, and those visits formed the basis for the judge's belief regarding the jury's confusion. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 462 (1978) (recognizing the "hazards of *ex parte* communication with a deliberating jury"). We add to this the fact that the jury returned a verdict shortly after receiving the Council for Court Excellence instruction, which increases the likelihood of coercion. *See Berroa*, 46 F.3d at 1198. On balance, the events surrounding the court's delivery of the nonstandard instruction suggest a substantial propensity for coercive effect. Because there is "no way to know" what transpired in the jury room following the charge, the government cannot meet its burden of proving the error harmless. *Ayeni*, 374 F.3d at 1317.

In short, by departing from the instruction approved in *Thomas*, the court acted in a presumptively coercive manner. The government has not rebutted this presumption. *See Spann*, 997 F.2d at 1516. We therefore reverse Yarborough's conviction and remand for a new trial.

*So ordered.*