Robert TRAPPS, Appellant,

v.

UNITED STATES, Appellee.

No. 03–CF–856.

District of Columbia Court of Appeals.

Argued Nov. 3, 2005.

Decided Dec. 1, 2005.

Jonathan R. Fellner, appointed by the court, for appellant.

Thomas S. Rees, with whom Kenneth L. Wainstein, United States Attorney, and John R. Fisher, Assistant United States Attorney at the time the brief was filed, and Thomas J. Tourish, Jr., Assistant United States Attorney, were on the brief, for appellee.

Before SCHWELB and REID, Associate Judges, and FERREN, Senior Judge.

REID, Associate Judge:

Appellant Robert Trapps was convicted of the offense of possession of cocaine with intent to distribute.[1] He filed a timely

---

1. Mr. Trapps was charged with multiple drug and weapon offenses, including unlawful possession with intent to distribute a controlled substance while armed, in violation of D.C.Code §§ 48–904.01(a), 22–4502 (2001) and unlawful possession of drug paraphernalia, in violation of § 48–1103(a). Most of the charges were dismissed by the trial court, but the case proceeded to trial on the lesser-included offense of possession with intent to distribute, and the unlawful possession of drug paraphernalia count. He was acquitted of the paraphernalia charge. The trial judge sentenced Mr. Trapps to eighteen months of incarceration and three years of supervised probation on the drug charge, but suspended the sentence and imposed two years of probation, with arrangements for a residential drug treatment program.

notice of appeal challenging his conviction on the grounds that the trial court erred by (1) giving the jury an improper aiding and abetting instruction; (2) twice charging the jury with anti-deadlock instructions during its deliberations; and (3) failing to grant his motion for judgment of acquittal. Discerning neither instructional nor evidentiary error, we affirm the judgment of the trial court.

## FACTUAL SUMMARY

To establish its case against Mr. Trapps, the government presented the testimony of several police officers from the Metropolitan Police Department ("MPD"). Officer Anthony Greene, an investigator for the Seventh District Narcotics Unit, who had participated in over 1,000 "narcotics-related arrests," was engaged in an undercover "pre-search warrant surveillance of ... 3731 Horner Place, [in the] Southeast [quadrant of the District of Columbia]," on November 6, 2001. Within a thirty-minute period of time, "there was a lot of foot traffic going to the door and knocking on the door," but none who knocked actually gained entrance. Eventually a green Cadillac drove up and a man, later identified as Moses Brown, exited the vehicle. "[A]ll [of] the people [who] were waiting out in front of the house rushed to the Cadillac." After Mr. Brown had "a brief conversation" with the people who had rushed to his car, he "reach[ed] into ... what appeared to be a center console" and "[with] a razor blade" he began "cutting some objects up." Money was given to Mr. Brown in exchange for some of the objects. Officer Greene believed that a drug transaction was in progress, and radioed information to members of the Seventh District vice unit.

Mr. Brown entered the Horner Place residence, and Officer Greene "advised" members of the Seventh District vice unit

that it was "a good time to do the search warrant," which Officer Boyd, who was seated in the vehicle with Officer Greene, had obtained prior to the surveillance. Officer Chris Huxoll, also of the Seventh District vice unit, was part of the search team. "In the basement of the [Horner Place] house [he] found empty ziplock bags, small empty bags, ... with some ... white powder residue, and some razor blades" as well as "a large quantity of a white rock substance that was also in ziplocks ...."; the empty ziplocks, as well as razor blades, and two plates with white powder residue "were located on top of the bar area," and some ziplocks, including those with a white substance, were inside of a drop ceiling. These items were seized by Officer Durriyyah Habeebullah, who at the time was part of the Seventh District's focus mission unit. Later, Officer Anthony Moye conducted a "field test [which] was positive for the presence of cocaine."

Officer Huxoll spoke with Mr. Trapps inside the Horner Place residence when the police seized the drugs found on the premises. In addition to the drugs, the police seized mail from the Horner Place residence dining room table which belonged to Mr. Trapps. Detective Mark Christopher Stone, assigned to MPD's major narcotics branch, gave expert testimony regarding the "distribution and use of narcotics" as well as the packaging and pricing of drugs. In his experience the street value of the cocaine seized from the Horner Place residence was in the range of $4,000.00.

Mr. Trapps was the only defense witness. He stated that he owned the Horner Place residence, and had lived there since 1978. He regularly went into the basement of his home because it had the only working bathroom in the house. Mr. Trapps allowed Mr. Brown into his home "three or four times." He admitted telling

Officer Cephas that "once or twice [he] had seen [Mr. Brown] sell drugs from [his] house," but that he had explained to Kenny Edmonds, an acquaintance of Mr. Brown who stayed in Mr. Trapps' basement for a period of time, that he did not "want the traffic . . . [or] the hassle . . . [or] the headache."

On cross-examination, in response to the question of whether "[he] knew [Mr. Brown] sold crack cocaine," Mr. Trapps stated: "Yes, I did. Yes." He acknowledged that "on certain occasions" others would "use [him]" to purchase drugs for themselves. As he put it, "I was like a go between sometimes if I was standing outside and they would ask where [Mr. Brown] was." Mr. Trapps was aware that Mr. Brown would go to the basement when he entered Mr. Trapps' home, and that "people from the neighborhood would come by knocking on [his] door looking for [Mr. Brown]." Mr. Trapps was asked whether he had "told [Officer Cephas] that [he] had seen [Mr. Brown] sell . . . narcotics from [Mr. Trapps'] house." Mr. Trapps replied, "Yes, ma'am. I did tell him that." In addition, Mr. Trapps was asked whether he informed Officer Cephas that Mr. Brown "had in fact sold drugs to [him]." He answered, "Yes," but later denied that this statement was true.

## ANALYSIS

### The Aiding and Abetting Instruction and the Challenge to the Sufficiency of the Evidence

Mr. Trapps primarily argues that even if a basis existed for giving the aiding and abetting instruction, "the [trial court] erred by incorrectly instructing the jury on the law." Specifically, he contends that the court improperly told the jury, "you must find that [the defendant] *knowingly associated himself with the person who committed the crime*," but should have

stated, "you must find that the defendant knowingly associated himself with the *commission of the crime*," (emphasis in original). The government contends that Mr. Trapps raised no objection in the trial court to the judge's aiding and abetting instruction and that, under the plain error doctrine applicable here, "there was no error of any stripe," let alone one "structural" or "plain."

Before considering the applicable law for the resolution of Mr. Trapps' aiding and abetting contention, we briefly set forth the factual context for this issue. The government argued in its opening statement that "Mr. Trapps by allowing [Mr.] Brown to use his house, to store . . . drugs in his house with the full knowledge that [Mr. Brown] was selling drugs, . . . he facilitated that drug operation, [and] he is as guilty as Mr. Brown himself." Near the end of the government's case, the trial judge alerted both counsel to her belief that an issue likely to surface is "whether it's appropriate for the [trial court] to give an aiding and abetting instruction on the charge of possession with intent to distribute." The government agreed, stating that it "will be requesting that instruction." Defense counsel said nothing about the trial court's inquiry. At the conclusion of the defense's case, the trial judge generally informed counsel about the instructions she planned to give, and asked if there was "any objection to these instructions." Defense counsel remarked, "at this time I'm satisfied." Shortly thereafter, however, defense counsel said: "At some point I'd like to go back to the aiding and abetting issue. I was trying to look for a case before I made my objection."

When the case resumed several days later, Mr. Trapps did not revisit the question concerning whether an aiding and abetting instruction would be appropriate. The trial court proceeded to charge the

jury; including the law concerning aiding and abetting.[2] At the end of the charge to the jury, the trial court inquired whether "the government [was] satisfied with the instructions," and then asked the defendant. Defense counsel said, "Yes, Your Honor."[3]

■ Under Super. Ct. Crim. R. 30, objection to a jury instruction must be raised with specificity before the jury begins its deliberations. And we have declared that "objections to jury instructions must be specific enough to direct the judge's attention to the correct rule of law." *Brown v. United States*, 881 A.2d 586, 593 (D.C.2005) (quoting *Russell v. United States*, 698 A.2d 1007, 1012 (D.C. 1997)) (other citations and internal quotation marks omitted). Furthermore, "[a] defendant's failure to raise objections in the manner required by Rule 30 limits the scope of our review to plain error." *Green v. United States*, 718 A.2d 1042, 1056 (D.C. 1998) (citation omitted). And, in reviewing a challenged instruction, we "consider the instruction as a whole in the context of the entire charge." *Id.* at 1058 (citations omitted).

■ Although Mr. Trapps informed the trial judge that, "at some point," he would like to return to the question as to whether the instruction was appropriate in his case, defense counsel never raised any specific objection to the instruction prior to the commencement of the jury's deliberations. Indeed, he expressed satisfaction with the instruction. The government's reliance on the aiding and abetting theory "was not a surprise," *Porter v. United States*, 826 A.2d 398, 409 (D.C.2003), since the government had mentioned its aiding and abetting theory in its opening statement, and the trial judge had raised the possibility of an aiding and abetting charge early in the trial. Thus, Mr. Trapps had ample opportunity to consider that theory and to raise any objection to it before the trial court instructed the jury, and even after the instruction was complete but before the jury retired to deliberate. Since he did

---

2. The aiding and abetting instruction was as follows:

You may find the defendant guilty of the crimes charged in the indictment without finding that he personally committed each of the acts that make up the crime, or that he was present while the crime was being committed.

Any person who in some way intentionally participates in the commission of a crime aids and abets the principal offender.

He, therefore, is as guilty of the crime as he would be if he had personally committed each of the acts that make up the crime.

To find that the defendant aided and abetted in committing a crime, you must find that he knowingly associated himself with the person who committed the crime, that he participated in the crime as something he wished to bring about, and that he intended by his actions to make it succeed.

Some affirmative conduct by the defendant to help in planning or carrying out the crime is necessary. Mere physical presence by the defendant at the place and time the crime is committed is not by itself sufficient to establish his guilt.

The government is not required to prove that anyone discussed or agreed upon a specific time or method [of] committing the crime, the government is not required to prove that the crime was committed in any particular way planned or agreed upon, nor need the government prove that the principal offender and the person alleged to be the aider and abettor directly communicated with each other.

It is not necessary that all the people who committed the crime be caught or identified. It is sufficient if you find beyond a reasonable doubt that the crime was committed by someone, and that the defendant knowingly and intentionally aided and abetted the principal offender in committing the crime.

3. Defense counsel raised no objection to the trial judge's response to a question concerning aiding and abetting, which the jury had posed during its deliberations.

not state an objection to the instruction with specificity in the trial court, our review is for plain error. *See Green, supra,* 718 A.2d at 1056, 1058; *Brown, supra,* at 881 A.2d at 593.

■ Mr. Trapps now complains specifically about the trial court's use of the language, "you must find that the [the defendant] knowingly associated himself *with the person who committed the crime,"* rather than the language now set forth in the Redbook instruction No. 4.02, "you must find that the defendant knowingly associated himself with the *commission of the crime."* Yet, we have approved that very instruction previously. *See Erskines v. United States,* 696 A.2d 1077, 1080 (D.C. 1997) ("[T]he jury was correctly told that to convict [the appellant] as an aider and abettor it had to find that he 'knowingly associated himself' with the person who committed the crime . . . .") (citation omitted); *Hammon v. United States,* 695 A.2d 97, 107 (D.C.1997) (trial court did not err in "instructing the jury that it could convict defendants as aiders and abettors . . . as long as the defendants knowingly associated themselves with the principal; participated in the crime, and intended to help the crime succeed"). When the aiding and abetting instruction given in this case is examined as a whole, *see Green, supra,* 718 A.2d at 1058, the trial court did not commit error, let alone plain error, in using the challenged words. Indeed, those words are consistent with D.C.Code § 22–1805 (2001) which focuses on "aiding or abetting *the principal offender"* [4] (emphasis added). Moreover, the challenged words are consistent with the elements of an aiding and abetting case that the trial court must prove. *See Hawthorne v. United States,* 829 A.2d 948, 952 (D.C.2003).

■ In addition to his complaint about the aiding and abetting instruction, Mr. Trapps contends that the trial court erred in denying his motion for judgment of acquittal. The trial court correctly viewed the evidence in the light most favorable to the government. *See Zanders v. United States,* 678 A.2d 556, 563 (D.C.1996) (citations omitted).

■ The evidence presented at trial demonstrated that Mr. Brown sold drugs illegally from Mr. Trapps' Horner Place house; Mr. Trapps admitted that he "told [Officer Cephas] that [he] had seen [Mr. Brown] sell narcotics from [his] house." Mr. Trapps not only resided at the Horner Place residence, but also owned it. Mr. Trapps was aware that people came to his home to buy drugs from Mr. Brown, and even admitted that he had obtained drugs from Mr. Brown himself. Thus, the first element of an aiding and abetting offense was met: "a crime was committed by someone." *Hawthorne, supra,* 829 A.2d at 952; *Price v. United States,* 813 A.2d 169, 176 (D.C.2002). In addition, the second element, "the accused assisted or participated in its commission," *Hawthorne, supra,* 829 A.2d at 952, also was satisfied since Mr. Trapps admitted not only that he knew Mr. Brown was engaging in drug transactions at the Horner Place residence, but that he, Mr. Trapps, "was like a go between sometimes if [he] was standing outside [his home] and [others] would ask where [Mr. Brown] was." Others "used [him]" to purchase drugs. Thus, there was evidence showing that Mr. Trapps "assisted or participated in [the] commission" of the crime charged, and "facilitat[ed]" the crime and "associated [himself] with the unlawful activity." *Bolden v. United States,* 835 A.2d 532, 535 (D.C.2003) (lessee

---

4. Section 22–1805 provides in pertinent part:
     In prosecutions for any criminal offense all persons . . . aiding or abetting the prin-cipal offender, shall be charged as principals . . . .

of property had knowledge of illegal drug activity there and "made the house available to others for the illicit activity"). And, Mr. Trapps' own testimony that he regularly used the only working bathroom in the basement, where the empty ziplock bags, razor blades and two plates coated with white powder residue were located on top of the bar, and that he told others "that this stuff had to stop," established the third element of aiding and abetting, that "his participation was with guilty knowledge." *Hawthorne, supra.* In short, Mr. Trapps cannot prevail on his sufficiency of the evidence argument. *See Earle v. United States,* 612 A.2d 1258, 1266 (D.C.1992); *Johnson v. United States,* 883 A.2d 135, 142 (D.C.2005).[5]

### The Anti–Deadlock Instruction

Mr. Trapps maintains that "[t]he trial court committed reversible error by giving two anti-deadlocking charges." On the first afternoon of jury deliberations, the jury sent a note to the trial court saying, "We, the jury, are hopelessly deadlocked on both charges." The trial court asked whether counsel wanted an anti-deadlock charge, or whether they would agree to an instruction used by the Honorable Gregory Mize, another trial judge in the Superior Court. The government expressed the view that "an anti-deadlocking charge [was] premature at [that] point" because "the jury has only had this case for ... just over four hours and the lunch period is included in there." Defense counsel opposed the Mize instruction on the ground that it "will not aid [the jury] in any manner." The trial judge decided to give the Mize instruction, but then to dismiss the jury for the day.[6] The following day, around late morning, the jury again sent a

---

5. Because there is sufficient evidence beyond a reasonable doubt to support the government's theory of aiding and abetting, we need not consider Mr. Trapps' argument regarding constructive possession of the narcotics. *See Selby v. United States,* 501 A.2d 800, 800 (D.C.1985) ("To convict of aiding and abetting in possession of narcotics, the government is not required to show that a defendant was in constructive possession of the drugs.") (citation omitted). We conclude that the evidence was sufficient to survive a motion for judgment of acquittal based on the government's aiding and abetting theory. It was therefore unnecessary for the jury to agree on whether the government presented sufficient evidence to show that appellant had "some appreciable ability to guide [the] destiny" of the contraband, as is required for constructive possession. *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987). "When the jury must choose between different versions of a single incident, we may presume that the unanimity requirement was satisfied." *Tyler v. United States,* 495 A.2d 1180, 1182 (D.C. 1985).

6. The trial court instructed the jury as follows:

    [F]irst of all, I want to compliment you on following so carefully my earlier instruc-

tion that whenever you send a note, that you not mention how you are divided on an issue. I have no idea on what lines you are divided and what the issues may be that are dividing you.

I'm very thankful that I do not know that, and I want to continue to be left without that knowledge unless and until you reach a[ ] unanimous verdict.

In addition, the Court is not interested in a decision. What I am interested in is offering help to you if [you] think the Court can be of help to you.

And when I say if the Court can be of help to you, I may enlist the assistance of the attorneys for each side in trying to be of help to you.

The goal here is not to force you to reach a verdict, or to suggest in any way what your verdict should be.

I am proposing that it may be helpful for you in the privacy of your jury room to identify areas of agreement and areas of disagreement that you are having.

If you care to make such identification, you may then wish to discuss the law and the evidence as they relate to those areas of disagreement.

If you still have disagreement, I invite you but I do not require you to identify any

note to the trial judge saying: "We believe we are hopelessly deadlocked and don't think we can come to a consensus on these issues." Government counsel and defense counsel agreed with the trial court's decision to give an anti-deadlocking charge. Defense counsel raised no objection at all.[7] Later that afternoon, around 3:36 p.m., the jury reached its verdict. On appeal, Mr. Trapps now argues that the trial court erred by giving a second anti-deadlocking instruction. He urges this court to follow *United States v. Yarborough*, 365 U.S.App. D.C. 137, 400 F.3d 17, 22 (C.A.D.C.2005), where the court reversed a conviction on the ground that the trial court "by departing from the [anti-deadlocking] instruction approved in [*United States v.*] *Thomas* [, 449 F.2d 1177 (D.C.Cir.1971) (en banc)], ... acted in a presumptively coercive matter."

■■■ Whether to give an anti-deadlock instruction is committed to the discretion of the trial court. *Carey v. United States*, 647 A.2d 56, 61 (D.C.1994). Our role on appeal is to determine whether, from all the surrounding circumstances, "it appears [that] [that charge] was coercive." *Id.* (citation omitted). And, "[t]he determination of whether coercion exists in a particular case is made by considering the coercive potential of the situation from the jurors' perspective and the effect of the

actions of the trial judge in exacerbating or alleviating potential coercion." *Davis v. United States*, 700 A.2d 229, 230 (D.C. 1997) (citing *Harris v. United States*, 622 A.2d 697, 701–02 (D.C.1993)). Furthermore, the anti-deadlock "instruction should not repeatedly be given to a 'hung jury' ...." *Epperson v. United States*, 495 A.2d 1170, 1176 (D.C.1985). Where the defendant does not make an objection with specificity in the trial court, our review is for plain error. Here, Mr. Trapp made no objection to the second instruction.

■■ Applying the plain error standard, we see no error at all. *Yarborough, supra*, a plain error case on which Mr. Trapps relies, reflects circumstances different from those in the case before us. While the Mize instruction has similarities with the Council for Court Excellence instruction (based on an Arizona model), which was given in *Yarborough*, it differed in a fundamental way, as used in this case. The Mize instruction began with a compliment: "I want to compliment you on following so carefully my earlier instruction that whenever you send a note, that you not mention how you are divided on an issue." In contrast, the instruction in *Yarborough* commenced with what could be interpreted as a criticism: "You've indicated to me that you're having trouble reach-

questions about the evidence of the final instructions of law regarding which you would like assistance from the Court or counsel.

If you choose this option, then please list in writing in as clear and simple language as you can fashion where further assistance might help you in bringing about a verdict.

In closing, I want to repeat that I do not wish or intend to force a verdict. I am merely trying to respond to your latest note.

If you think this offer might be of assistance, then I think it would be wise to give it a try.

But because of the late hour, I'm going to excuse you for the day and ask you to

return tomorrow at 9:30 to continue your deliberations in light of this additional instruction.

7. After informing government and defense counsel about the jury's note, the trial judge said: "Counsel, what I propose to do is give them the anti-deadlocking charge, Alternative B. Is there any objection?" Defense counsel replied: "No, Your Honor." The trial judge then gave the instruction set forth in *Winters v. United States*, 317 A.2d 530, 534 (D.C. 1974); *see also* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.91 (4th ed. 1993).

ing a unanimous verdict. I think the record should reflect that you have now been deliberating for a longer period of time than it took you to hear the evidence in this case. I'm very mindful of that." *Id.* at 19. As the court said in *Yarborough,* "[t]he jurors could have taken the remark as a rebuke for engaging in excessively drawn out deliberations." *Id.* at 22. Furthermore, the jury in *Yarborough* returned a verdict not long after receiving the anti-deadlocking instruction, which the court declared "increases the likelihood of coercion." *Id.* Here, the trial court delivered the Mize instruction and then dismissed the jury for the day. After receiving another note on the following day stating that the jury was deadlocked, the trial judge gave an anti-deadlock instruction in the late morning, but the jury did not return a verdict until the late afternoon.

Neither the Mize instruction nor the anti-deadlock instruction given in this case can be said to have increased the likelihood of coercion.[8] Nor do we have in this case "events surrounding the court's delivery of the [Mize] instruction [that] suggest a substantial propensity for coercive effect." *Id.* The events in *Yarborough,* which included the trial judge's entrance into the jury deliberation room without government and defense counsel or a court reporter,[9] "suggest[ed] a substantial propensity for coercive effect." *Id.* In short, the court in *Yarborough* determined that the trial court committed plain error in departing from the standard anti-deadlock instruction because of the events surrounding the giving of the non-traditional

instruction and because the jury could have interpreted the first part of the instruction as a rebuke. That combination of circumstances does not exist in this case.

Based upon our review of the record, as well as the context and circumstances under which the anti-deadlock instruction was given, we are satisfied that the trial court did not commit any error, let alone plain error. *See Nelson v. United States,* 378 A.2d 657, 661 (D.C.1977) ("In determining whether the instruction in the present case was so coercive as to constitute plain error, we must ... consider it 'in its context and under all the circumstances.' ") (citing *Jenkins v. United States,* 380 U.S. 445, 446, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965)).

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*

---

8. Indeed, the Mize instruction is not a *Winters,* or anti-deadlock-type instruction.

9. On the first occasion, the judge informed the jury that a requested exhibit could not be provided, but the court also spoke with the jury concerning two additional questions posed. The second time the judge went to the jury room to release the jury and was asked a

question about an instruction. The trial judge told the jury that its questions would have to be discussed with counsel. In addition, when the judge received the note declaring that the jurors were "at a standstill," the judge questioned the jurors in open court as to the reason for the standstill.