# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 28, 2020        Decided January 5, 2021

No. 19-3074

UNITED STATES OF AMERICA,
APPELLEE

v.

PATRICIA DRISCOLL,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cr-00166-1)

*Brian W. Stolarz* argued the cause and filed the briefs for appellant.

*Peter S. Smith*, Assistant U.S. Attorney, argued the cause for appellee.  With him on the brief were *Elizabeth Trosman*, *Chrisellen R. Kolb*, *Virginia Cheatham*, and *Kathryn L, Rakoczy*, Assistant U.S. Attorneys.

Before: WILKINS, KATSAS and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*:  In November 2018, after a four-week jury trial, Appellant Patricia Driscoll was convicted of two counts of wire fraud, one count of first-degree fraud, and two counts of tax evasion.  On appeal, Driscoll argues that the District Court committed several errors that warrant a new trial or dismissal of the indictment.  Specifically, she contends that the District Court erred in denying her motion for mistrial or dismissal based on *Brady* and Fifth Amendment violations.  She argues that the District Court should have granted a pretrial discovery motion that would have revealed Government misconduct.  And she argues that the District Court delivered multiple coercive anti-deadlock instructions to the jury.

We agree that the anti-deadlock instructions likely coerced a unanimous verdict.  Accordingly, we vacate Driscoll's convictions and remand for a new trial.  As to the *Brady* claim, we find no prejudice, so we affirm the District Court's denial of the motion to dismiss the indictment.

Because we remand for a new trial, we do not address Driscoll's pretrial discovery argument.  And for the reasons explained below, we do not reach Driscoll's Fifth Amendment argument.

**I.**

Driscoll is the former president of a nonprofit organization in Washington, D.C.  On May 22, 2015, ESPN published an article detailing fraud allegations against her.  The article indicated that a former employee of the nonprofit had contacted the FBI, and the same employee planned to file an IRS whistleblower complaint which might lead to charges of embezzlement and fraud against Driscoll.

The following month, Driscoll participated in a public hearing against her ex-husband over the custody of their child. During that four-day trial, Special Agent Robert Valdini—an IRS criminal investigator—showed up, sat in the courtroom, and observed testimony, including testimony from Driscoll about her finances. Driscoll approached Valdini and asked who he was, and Valdini responded that he was a member of the public. Valdini also observed testimony from Tanya Finch, a cousin of Driscoll's ex-husband who also happened to be the IRS whistleblower.

Valdini took detailed notes during the custody hearing, gathering information for the criminal investigation against Driscoll. Valdini had been authorized to attend the hearing by an Assistant United States Attorney. And during the first three days of the hearing, Valdini prepared memoranda of activity, documenting testimony and exhibits relevant to the criminal investigation.

On the final day of the custody hearing, Valdini took no notes and prepared no memoranda. That day, he connected with Driscoll's ex-husband, along with the ex-husband's new wife and the couple's custody lawyer. The four of them went to lunch together at the request of Driscoll's ex-husband, who offered to provide Valdini information about Driscoll to aid in the criminal investigation.

On September 20, 2016, Driscoll was indicted on eight counts of fraud and tax evasion. In April 2017, defense counsel filed pretrial motions, including a motion for discovery on a "parallel proceeding" issue. In that motion, defense counsel asked the District Court to authorize discovery on whether the Government had used a civil "audit" process to gather information for Driscoll's criminal case. *See generally United States v. Kordel*, 397 U.S. 1, 13 (1970) ("Government may not use evidence against a defendant in a criminal case which has

been coerced from him under penalty of either giving the evidence or suffering a forfeiture of his property."). The Government opposed the motion, arguing that it had already provided substantial discovery about the IRS agent involved in the case (including a "memorandum and handwritten notes"), and calling Driscoll's request "unfounded." J.A. 129. In reply, Driscoll raised the child custody hearing for the first time as an issue warranting discovery. The Government moved to strike portions of the reply for raising new issues, but then argued in sur-reply that the defense was "not entitled" to further discovery. J.A. 174, 183. In August 2017, the District Court denied the motion in a minute order.

Trial began on October 17, 2018. Two weeks into trial, Valdini's conduct at the child-custody hearing—and specifically, his lunch with Driscoll's ex-husband—came to light through cross-examination of a Government witness and subsequent questioning of the prosecutors by the District Court. Government counsel had not been aware of Valdini's lunch outing, but after conferring with agents involved in the investigation, the Government disclosed Valdini's actions to the District Court. The District Court ordered the Government to produce "detailed, under oath account[s] of everything that happened." J.A. 236.

The following day, the Government submitted affidavits from Valdini, two FBI agents, and Tanya Finch. The District Court interrupted the trial and held an evidentiary hearing to call Valdini and others involved in the child-custody proceeding. At the evidentiary hearing, Valdini testified to attending Driscoll's custody trial, misrepresenting his identity to Driscoll, and preparing memoranda of activity for each day except the last, when he met with Driscoll's ex-husband and others.

Driscoll moved for a mistrial or dismissal, arguing that 1) Valdini's presence at the child-custody hearing violated her Fifth Amendment right against self-incrimination, and 2) the Government violated *Brady* by failing to disclose Valdini's conduct. The District Court denied the motions. On the Fifth Amendment claim, the District Court found that Valdini's misrepresentations had not lured Driscoll into self-incrimination. She was already on notice of her potential criminal liability before the hearing due to the ESPN article, and she was testifying at a public proceeding where a transcript could be obtained by anyone. Additionally, the District Court found no prejudice under *Brady* because Driscoll's case-in-chief had not begun, and defense counsel could use the evidence effectively as impeachment evidence going forward.

Jury deliberations in Driscoll's trial began on Tuesday, November 20. The jury deliberated for approximately 45 minutes before breaking for Thanksgiving. After returning on Monday, November 26, the jury sent a note to the District Court at 11:20 am, stating: "We have one person that has his mind made up and will not change his mind. What do we do?" J.A. 379.

The District Court proposed reading instructions 2.510 and 2.601(III)(A) from the Criminal Jury Instructions for the District of Columbia (*i.e.*, the "Red Book"). While these instructions are used in both D.C. local and federal courts, the second instruction—known as the anti-deadlock *Thomas* charge—adopts the exact language approved by this Court for breaking a deadlocked jury. *See United States v. Thomas*, 449 F.2d 1177, 1184 nn.45–46 (D.C. Cir. 1971) (en banc).[1]

---

[1] The Government initially opposed using an anti-deadlock charge, arguing that it was too soon to use such an instruction, but defense counsel did not object. The Government eventually agreed to the

The District Court called the jury back into the courtroom and read Instruction 2.510[2] and Instruction 2.601(III)(A), the *Thomas* charge.[3]  After reading the *Thomas* charge, the District Court continued:

---

instruction when the District Court decided to strike the words "Anti-Deadlock Instruction" from the title.

[2] Red Book Instruction 2.510, "Attitude and Conduct of Jurors in Deliberations," reads as follows:  "The attitude and conduct of jurors at the beginning of their deliberations are matters of considerable importance. It may not be useful for a juror, upon entering the jury room, to voice a strong expression of an opinion on the case or to announce a determination to stand for a certain verdict. When one does that at the outset, a sense of pride may cause that juror to hesitate to back away from an announced position after a discussion of the case. Furthermore, many juries find it useful to avoid an initial vote upon retiring to the jury room. Calmly reviewing and discussing the case at the beginning of deliberations is often a more useful way to proceed. Remember that you are not partisans or advocates in this matter, but you are judges of the facts."

[3] Red Book Instruction 2.601(III)(A), also known as the *Thomas* charge, reads as follows:  "The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree to the verdict. In other words, your verdict must be unanimous. It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict. You are not partisans. You are judges—judges of the facts. Your sole interest should be to reach a just verdict from the evidence in the case."

> And we all appreciate that this isn't easy, this is hard work, going through evidence and going through the charges, we appreciate that and we thank you for that. And we'll thank you more than once for that because we know it's not easy. But it is really important, really important to the parties and to the community, to the country.

J.A. 390. Defense counsel then objected to the instruction, arguing that the additional references to "community" and "country" might be taken by jurors to mean "the Government."

The next day, at 3:15 PM, the jury sent another note indicating its inability to reach agreement. This time, the note read: "One Juror is not following the Judges rules [*sic*]. He already has his mind made up, and he is not basing his decision on the facts. Is it possible to request an alternate juror?" J.A. 393. Defense counsel suggested a *voir dire* of the holdout juror, and the Government suggested the Court speak with the jury foreperson. The District Court called the jury back, and began by referencing the previous day's instruction:

> Well, yesterday I gave you instructions, follow-up instructions to deal with, a note that has some similarities to this note, and I stand by that. And you have those—you'll have that one instruction in the book of instructions I've already given you.[4] And I think I addressed the issue as to the necessary spirit and approach that

---

[4] It appears from the record that the "one instruction" jurors had in writing was Instruction 2.510, not the *Thomas* instruction. *See* J.A. 390, 408 ("[T]hey don't have the *Thomas* instruction with them. They have the first one in their instructions.").

each juror must take as it relates to deliberations, and I stand by that.

J.A. 401. The Court continued:

In my judgment, it is way too premature to be requesting an alternate juror.

I hope, and I hope time will show, that whichever juror this is, that he or she will embrace the spirit and the language that I read yesterday and will come around to keeping an open mind and discussing with the other jurors their position as it relates to the facts that they believe have been proven in this case. So that's my answer to the second note.

J.A. 401–02. Defense counsel objected to this instruction, arguing that it was effectively an anti-deadlock instruction devoid of crucial *Thomas* language. The District Court responded that the instruction functionally included the "second half of the *Thomas* instruction," because it "encourage[d] [the jurors] to follow the letter and the spirit of what I read to them yesterday." J.A. 407.

The following day, the jury sent another note at 4:25 pm indicating it had reached a partial verdict: "We are unanimous on 3 counts and deadlocked on 2 counts." J.A. 411. At that point, the Government and Driscoll both asked the District Court to take the partial verdict, and Driscoll moved for a mistrial on the remaining counts. The Government did not oppose the mistrial motion.

The Court called the jury back and read an instruction nearly identical to Red Book 2.601(I), the standard "Initial

Instruction to Jury that Indicates It Cannot Agree."[5] The jury had been deliberating for approximately 16 hours, and the District Court stated that this was "not unusual" given the "amount of documents" and witnesses in the case. J.A. 420. The District Court further instructed: "As a result, I'm going to ask you to continue deliberations in this case tomorrow. Keep an open mind about the case, with a view of listening to others and expressing your own point of view, to see whether you can reach unanimity on these other two counts." J.A. 420. The District Court then reminded jurors twice more to "keep an open mind" before sending them home. J.A. 420–21.

The jury reconvened at 10:00 am the following morning. At 11:10 am, the jury reached a unanimous guilty verdict on all five counts.

## II.

We first address Driscoll's argument that the District Court improperly denied her motions for mistrial and dismissal of the indictment. Driscoll contends that the District Court erred in denying her motion for mistrial or dismissal because: 1) Valdini's presence at her child-custody hearing violated her

---

[5] Red Book Instruction 2.601(I) reads as follows: "Your note indicates that you have been unable to reach a unanimous decision at this time. [This has been a relatively long trial—longer than many trials we have in this courthouse. There were a large number of witnesses who testified and a substantial amount of evidence received, and I would expect that it would take some time to reach a resolution of this matter.] My best judgment is that you have been deliberating for a total of about [[insert number] [hours] [days]], which is not unusual in cases such as this. As a result, I am going to ask that you deliberate further in this case and that you keep an open mind about the case with a view to listening to others and expressing your own point of view to see whether you can reach a unanimous decision. Please resume your deliberations at this time."

Fifth Amendment right against self-incrimination, and 2) the Government's failure to disclose Valdini's improper conduct at the child-custody hearing violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963).

Driscoll did not develop her Fifth Amendment argument until the reply brief, so we do not address it. *See Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("It is not enough merely to mention a possible argument in the most skeletal way . . . . [A] litigant has an obligation to spell out its arguments squarely and distinctly . . . ."). As to the *Brady* claim, we agree with the District Court that the non-disclosure did not result in prejudice, so we affirm the denial of the motions for mistrial or dismissal.

**A.**

Typically, this Court reviews the denial of a mistrial or new trial for abuse of discretion. *United States v. McLendon*, 378 F.3d 1109, 1112 (D.C. Cir. 2004) (citing *United States v. Gartman*, 146 F.3d 1015, 1027 (D.C. Cir. 1998)); *United States v. Sitzmann*, 893 F.3d 811, 821 (D.C. Cir. 2018) (per curiam) (quoting *United States v. Johnson*, 519 F.3d 478, 487 (D.C. Cir. 2008)), *cert. denied*, 140 S. Ct. 1551 (2020). But the question of "whether the Government has breached its obligations under *Brady* is a question of law that is reviewed *de novo*." *United States v. Borda*, 848 F.3d 1044, 1066 (D.C. Cir. 2017) (citing *United States v. Emor*, 573 F.3d 778, 782 (D.C. Cir. 2009); *Johnson*, 519 F.3d at 488). The remedy for a *Brady* violation is a new trial, but dismissal is an appropriate remedy of last resort "where no other remedy would cure prejudice against a defendant." *United States v. Pasha*, 797 F.3d 1122, 1139 (D.C. Cir. 2015).

11

"To prove a *Brady* violation, the movant must demonstrate three elements." *Borda*, 848 F.3d at 1066. "First, the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching. Second, the evidence must have been suppressed by the government, either willfully or inadvertently. And third, prejudice must have ensued." *Sitzmann,* 893 F.3d at 826 (internal citations, brackets, and quotation marks omitted). To prove prejudice, "the defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (internal quotation marks omitted) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "A new trial will rarely be warranted based on a *Brady* claim where the defendant obtains the information in time to use it at the trial." *Borda*, 848 F.3d at 1067 (quoting *United States v. Andrews*, 532 F.3d 900, 907 (D.C. Cir. 2008)).

Driscoll's *Brady* claim fails because she has not demonstrated prejudice. The District Court held an evidentiary hearing to call Valdini and other witnesses involved in the family-court trial. Defense counsel was able to question Valdini extensively about his conduct at the child-custody hearing—including his lack of notes and memoranda on the final day, and his lunch with Driscoll's ex-husband. All of this evidence was disclosed before defense began its case-in-chief, and the District Court gave counsel a "wide berth" to use it during trial. J.A. 340–41.

The record shows that defense counsel made significant use of the evidence to cross-examine Valdini in front of the jury. *See* J.A. 354–55 ("And [they] asked you if you wanted to go out to lunch; is that right?"); *id.* at 359 ("[I]sn't it true that you did not write a memo of activity for the last day?"). Defense also recalled Tanya Finch in its case-in-chief and questioned her about her biases. The District Court questioned

Valdini separately about his surveillance of the child-custody hearing.

Driscoll has not persuaded us of a reasonable probability that earlier disclosure of this evidence would have changed the outcome of her case. She asserts that she was "forced to accept" Valdini's testimony on certain topics. Appellant Br. 47. Specifically, she argues she was unprepared for Valdini's testimony that he discussed her child-custody case with the AUSA and a supervisor before attending the hearing. And she asserts that Valdini was untruthful when he testified that he was not asked to identify himself at the child-custody hearing by court staff—while another witness testified that Valdini *was* asked to identify himself by court staff.

Given the ample opportunity defense counsel had to cross-examine Valdini after the evidentiary hearing and to call witnesses to impeach Valdini, the argument that Driscoll was "forced to accept" answers and could not probe apparent contradictions is unpersuasive. We agree with the District Court that Driscoll was not prejudiced by the timing of the Government's disclosure of Valdini's actions. Accordingly, we affirm the District Court's denial of the motions for mistrial or dismissal based on *Brady*.

## III.

We now turn to Driscoll's argument that the anti-deadlock jury instructions were coercive upon the jury. We conclude that the instructions likely coerced a unanimous verdict against Driscoll. While no single instruction alone may have constituted error, "on balance, the events surrounding the court's delivery of the nonstandard instruction[s] suggest a substantial propensity for coercive effect." *United States v. Yarborough*, 400 F.3d 17, 22 (D.C. Cir. 2005).

**A.**

In *United States v. Thomas*, this Court sought to prevent undue coercion on jurors by exercising its supervisory authority to mandate the use of standardized language in the anti-deadlock instruction given in this Circuit. *See* 449 F.2d 1177, 1184–86 (D.C. Cir. 1971) (en banc). We explained that "appellate courts should no longer be burdened with the necessities and niceties—and the concomitant uncertainties— of gauging various *Allen*-type renditions in terms of the coerciveness of their impact." *Id.* at 1186. In the years since *Thomas*, we have repeatedly cautioned district courts against "expanding on the *Thomas* script after a jury indicates deadlock." *United States v. Lloyd*, 515 F.3d 1297, 1305 (D.C. Cir. 2008); *Yarborough*, 400 F.3d at 21 ("Any substantial departure from the language approved in *Thomas* is presumptively coercive." (internal quotation marks omitted)); *United States v. Berroa*, 46 F.3d 1195, 1197 (D.C. Cir. 1995) ("We therefore flatly refuse the district court's invitation to crack open the Pandora's box *Thomas* nailed shut."); *United States v. Spann*, 997 F.2d 1513, 1519 (D.C. Cir. 1993) ("[W]e remind the district court judges of the mandate delivered in *Thomas* and that failure to comply therewith may under other circumstances lead to reversal.").

One of the central concerns of the *Thomas* Court was the potential for coercion by "prying individual jurors loose from beliefs they honestly have." *Thomas*, 449 F.2d at 1182. The *Thomas* charge thus cautions jurors to "consult with one another . . . with a view to reaching an agreement," but "do not surrender honest conviction . . . solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict." Criminal Jury Instructions for D.C. Instruction 2.601(III)(A). "Any substantial departure from the language approved in *Thomas* is presumptively coercive." *Yarborough*,

400 F.3d at 21 (internal quotation marks omitted); *see also Spann*, 997 F.2d at 1518 (noting that the "most significant [element] to . . . the *Thomas* court" was the language that "no juror should surrender his honest conviction" (internal quotation marks omitted)).

Here, over the course of three jury instructions, the District Court increasingly strayed from the language of *Thomas*. Taken together, under the circumstances of this case, these instructions likely coerced a lone holdout juror to surrender his or her honestly held views in favor of a unanimous verdict.

The initial note from the jury indicated that there was a holdout: one person had "his mind made up and [would] not change his mind." J.A. 379. The District Court responded to this note by reading the *Thomas* charge, but the District Court also added, without advance notice to the parties, improvised remarks about the importance of rendering a verdict "to the parties and to the community, to the country." J.A. 390.

Driscoll argues that this add-on language impermissibly deviated from *Thomas* and suggested—by reference to "country" and "community"—that the jury had a duty to convict. Appellant Br. 59. She correctly cites *Yarborough* for the proposition that "[a]ny substantial departure from the language approved in *Thomas* is presumptively coercive." *Yarborough*, 400 F.3d at 21 (internal quotation marks omitted). But even though the language here departed from *Thomas*, we conclude that this language, in isolation, did not affect Driscoll's substantial rights. *See* FED. R. CRIM. P. 52(a). The District Court shared the language about parties, community, and country after reciting the full *Thomas* instruction and thanking jurors for their work. Jury service is always a service to the parties, community, and country, and the acknowledgment of that fact could not reasonably be taken to suggest that a unanimous guilty verdict must be rendered, or

that an individual juror should abandon her views. Furthermore, the jury remained completely deadlocked after this instruction, so the instruction appears to have had no coercive effect. *See Spann*, 997 F.2d at 1518 (holding that "the trial judge's comments" were "probably proscribed under *Thomas*," but they "had no direct effect on the jury [because] . . . they did not break the jury deadlock or cause the guilty verdict").

Driscoll also contends that the District Court should have given the initial 2.601(I) instruction or inquired into the "nature of" the jury's deadlock before issuing the *Thomas* instruction. Appellant Br. 58 (citing *Barbett v. United States*, 54 A.3d 1241, 1246–47 (D.C. 2012)); *id.* at 64. But Driscoll encouraged the District Court to give the *Thomas* instruction, so she cannot now argue that the order of the instructions or the failure to inquire into the nature of the deadlock constituted error.[6] *See United States v. Kanu*, 695 F.3d 74, 80 (D.C. Cir. 2012) ("[U]nder the invited error doctrine [] a party may not complain on appeal of errors that he himself invited or provoked the district court to commit." (quoting *United States v. Wells*, 519 U.S. 482, 488 (1997))).

Nonetheless, the District Court's subsequent instruction deviated even further from *Thomas*. Upon receiving the second

---

[6] Although Driscoll waived an objection to the timing of the *Thomas* instruction, she did not waive her objection to the actual language used by the Court (*e.g.*, the additional wording about "parties," "community," and "country"). This is because the District Court did not discuss this language in advance with counsel, so Driscoll had no opportunity to raise an objection ahead of time. We caution district courts to always consult with counsel about the wording of a jury instruction before the instruction is given, so that counsel may place objections on the record and suggest modifications before the jury hears the charge. This practice is far preferable to attempting to "unring the bell" after a problematic instruction has been given.

note stating that a juror was "not following" rules and "ha[d] his mind made up," J.A. 393, the District Court called the jury to the courtroom, briefly referenced the previous day's instructions, and then effectively addressed the holdout juror directly with an instruction:

> I hope, and I hope time will show, that whichever juror this is, that he or she will embrace the spirit and the language that I read yesterday and will come around to keeping an open mind . . . .

J.A. 401. While this second instruction reminded the holdout juror to "keep[] an open mind," it eliminated what we have described as *Thomas*'s "most significant" element—"do not surrender honest conviction . . . for the mere purpose of returning a verdict," Criminal Jury Instructions 2.601(III)(A); *see Spann*, 997 F.2d at 1518—while calling direct attention to the holdout juror.

The Government argues that this second instruction was not coercive because the District Court prefaced it by reminding jurors of the previous day's (*Thomas*) instructions, and because the District Court's language did not suggest a juror should change his mind. Gov. Br. 53. We disagree. First, the District Court only made cursory mention of the previous day's instructions—not enough to constitute a second *Thomas* charge.[7] And second, the District Court called upon the holdout juror, in the courtroom, to "come around to keeping an open mind" without reminding the juror to maintain "honest conviction[s]." Criminal Jury Instructions 2.601(III)(A). An individual could have reasonably understood that language to

---

[7] Given our finding that this particular combination of instructions to the jury was coercive, we need not reach Driscoll's argument that giving additional instructions designed to encourage unanimity following the *Thomas* instruction was *per se* error.

mean she should become willing to change her mind, notwithstanding her honest convictions. *See Thomas*, 449 F.2d at 1183 ("No juror should be induced to agree to a verdict by a fear that a failure . . . to agree will be regarded by the public as reflecting upon either his intelligence, or his integrity." (quoting *Kesley v. United States*, 47 F.2d 453, 454 (5th Cir. 1931))); *see also id.* at 1181 ("When efforts to secure a verdict from the jury reach the point that a single juror may be coerced into surrendering views conscientiously entertained, the jury's province is invaded and the requirement of unanimity is diluted."). The potential for undue coercion was particularly acute here, where the judge addressed an individual juror directly—in front of all of his or her peers—since the other jurors could use the judge's words to wear down the holdout once they returned to the jury room. *Cf. Mullin v. United States*, 356 F.2d 368, 370 (D.C. Cir. 1966) (Burger, J.) ("It would have been a precarious undertaking for the Judge to give a supplemental charge to consider each other's views when he was already advised that only [a minority of] jurors voted for acquittal."). And indeed, the second jury instruction appeared to move the holdout juror: The jury's third note stated that it had reached a unanimous verdict on three counts, remaining deadlocked on two.

The District Court's final instruction was additionally coercive. This instruction initially hewed closely to Red Book Instruction 2.601(I), but later included additional improvised remarks that twice reminded jurors to "keep an open mind." J.A. 420–21. While there is nothing that prevents a District Court from reading Instruction 2.601(I) when the jury indicates an inability to agree, *cf. United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 207–08 (D.C. Cir. 2013) (reviewing for plain error), its use can be problematic after the jury formally announces a "deadlock," because the instruction reminds jurors to "[k]eep an open mind" while saying nothing about maintaining honest convictions. Under the circumstances of

this case, where jurors had deliberated for sixteen hours, received prior sets of instructions including the *Thomas* instruction, and continued to report themselves deadlocked, the jury should at least have been reminded of the need to maintain honest convictions to "insure against even the suggestion of juror coercion," *Lloyd*, 515 F.3d at 1305—particularly when, in the third instruction, jurors were told three separate times to "keep an open mind." In other words, the potential for coercion was heightened by the timing of this final instruction. Notably, both the Government and Driscoll asked the District Court to take a partial verdict rather than issue this last instruction, and the Government expressed reservations about giving Instruction 2.601(I) to the jury at this stage. J.A. 418–19; *see* District Court Tr. Nov. 28, 2018, at 14 ("[I]t's been our position all along that the Court can't read additional anti-deadlock instructions.").

The Government now argues that this third instruction was permissible because "in essence" it reminded jurors to maintain their honest convictions. Gov. Br. 56. "We decline the government's invitation to elevate form over function." *Yarborough*, 400 F.3d at 21. The fact of the matter is that this third instruction omitted this critical element, and the instruction's coercive effect is evident from the "fact that the jury returned a verdict shortly after." *See id.* at 22 (noting that a short turnaround time "increases the likelihood of coercion"). After deliberating for sixteen hours, the jury was deadlocked on two counts—but after receiving this third instruction, the jury took only one hour and ten minutes to reach a unanimous guilty verdict on those two remaining counts. The "swift resolution of the issues in the face of positive prior indications of hopeless deadlock" suggests that this third instruction influenced the verdict. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 462 (1978).

"[C]oercive effects never can be proven with certainty," but where instructions show a "substantial propensity for prying individual jurors from beliefs they honestly have," the affected verdict cannot stand. *See Yarborough*, 400 F.3d at 22 (quoting *Thomas*, 449 F.2d at 1182); *see also United States v. Strothers*, 77 F.3d 1389, 1391 (D.C. Cir. 1996). If "efforts to secure a verdict from the jury reach the point that a single juror may be coerced into surrendering views conscientiously entertained," then "the requirement of unanimity is diluted." *Thomas*, 449 F.2d at 1181. Taken together, the instructions in this case had a substantial propensity to coerce a holdout juror into foregoing her conscientiously held convictions in favor of a unanimous verdict. The combination of three anti-deadlock type charges—where the second spoke directly to a holdout juror about keeping an "open mind" without also reminding the juror not to surrender "honest convictions," and the third likewise lacked an admonition to maintain "honest convictions" notwithstanding three admonitions to "keep an open mind"—suggests that unanimity here was attained by coercion and that the error was not harmless. Accordingly, Driscoll's convictions must be reversed.

## IV.

For the foregoing reasons, we vacate Driscoll's convictions and remand for a new trial.

*So ordered.*