# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued November 6, 2006          Decided June 22, 2007

No. 05-3026

UNITED STATES OF AMERICA,
APPELLEE

v.

ANTHONY HARRIS,
APPELLANT

---

Consolidated with
05-3033

---

Appeals from the United States District Court
for the District of Columbia
(No. 04cr00157-01-02)

---

*Matthew D. McGill* and *James W. Beane, Jr.*, appointed by the court, argued the causes for appellants. With them on the briefs was *Miguel A. Estrada.*

*Nicholas P. Coleman*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Kenneth L. Wainstein*, U.S. Attorney at the time the brief was filed, and *Roy W. McLeese, III* and *Martin D. Carpenter*, Assistant U.S.

Attorneys. *Thomas J. Tourish, Jr.*, Assistant U.S. Attorney, entered an appearance.

Before: GARLAND and BROWN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

Opinion dissenting in part filed by *Senior Circuit Judge* WILLIAMS.

BROWN, *Circuit Judge*: This case arises from a peculiar example of urban entrepreneurship—the drive-by drug bazaar. The essential components of these enterprises include a wholesaler with an appreciable stash of drugs (the "bagman"), one or more retail clerks to handle individual transactions ("runners"), and a handy supply of customers who wait in vehicles, engines idling, while the merchandise is delivered. At about 2:30 A.M. on March 3, 2004, Metropolitan police officers noticed (as one would later testify) "a long line of cars that appeared to be getting served by hand-to-hand transactions . . . like a drive-through." Trial Tr. 79, Oct. 13, 2004. One man "was standing on the curbside" while two others "were flagging down and running up to cars" bringing what appeared to be currency from the cars to the bagman and clear plastic bags from the bagman to the cars. *Id.* at 108. The police moved in for the bust. One of the two runners, Anthony Harris, promptly surrendered. The other, Antonio Roundtree, led police on a quarter-mile chase and then "gave up. . . . [H]e said he was too tired and couldn't run no more." *Id.* at 84. The bagman ran and escaped. A search of Roundtree and Harris yielded neither drugs nor money, but where the bagman had been standing, officers found tucked behind a street sign a plastic bag containing 37.6 grams of crack cocaine in 101 small baggies. Roundtree and Harris were arrested; by the end of March, they were indicted for possession

with intent to distribute five grams or more of cocaine base in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(iii).  The two pled not guilty, went to trial on October 13, and were convicted on October 18.

On appeal, Harris and Roundtree present one individual claim each and share two claims in common.  Harris argues his trial counsel was ineffective for failing to raise a Speedy Trial Act claim.  Roundtree argues the district court committed reversible error by curtailing testimony from favorable witnesses.  Both defendants claim the trial judge's *ex parte* contact with the deliberating jury prejudiced the verdict.  And both defendants protest an approach to aiding and abetting that makes them liable for the *quantity* of five grams or more of crack cocaine.  Finding that the district court did not violate the Speedy Trial Act, abuse its discretion in circumscribing direct examination, substantially and injuriously influence the jury's verdict through its *ex parte* contact, or err in its approach to aiding and abetting, we affirm the judgment of the district court.

I

We begin in the pretrial period with Anthony Harris's ineffective assistance of counsel claim. About six months went by between indictment and trial in this case.  During that time, Antonio Roundtree was released on bail, while Anthony Harris, a young man with what the district court called a "ridiculous" criminal history (including fifteen convictions, among them contempt, escape, and violation of the Bail Act, and about twice as many arrests), was held as a flight risk.  Sentencing Hr'g Tr. 26, Feb. 18, 2005.  Arguing his lengthy pretrial detention violated the Speedy Trial Act, which requires that a criminal trial "shall commence within seventy days from the filing date . . . of the information or indictment" barring periods of excludable delay, 18 U.S.C. § 3161(c)(1), Harris claims his trial counsel was constitutionally deficient for not saying so, and that

but for this deficiency, a timely motion would have led to his release.

An ineffective assistance of counsel claim, according to the *Strickland v. Washington* two-prong test, 466 U.S. 668 (1984), requires determining, first, on a "highly deferential" standard of review and with great regard for counsel's "strategic choices," whether counsel's performance was so deficient as to fall "below an objective standard of reasonableness" and deprive defendant of the "'counsel' guaranteed . . . by the Sixth Amendment," and, second, whether counsel's deficient performance was prejudicial, *i.e.*, whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687–94. This test is fact-intensive, and the facts at issue are often orthogonal to those explored at trial. *Massaro v. United States*, 538 U.S. 500, 505 (2003) ("The evidence introduced at trial . . . will be devoted to issues of guilt or innocence, and the resulting record in many cases will not disclose the facts necessary to decide either prong of the *Strickland* analysis."). Thus where a defendant asserts an ineffective assistance of counsel claim for the first time on direct appeal, as Harris does, "this court's general practice is to remand the claim for an evidentiary hearing unless the trial record alone conclusively shows that the defendant either is or is not entitled to relief." *United States v. Rashad*, 331 F.3d 908, 909–10 (D.C. Cir. 2003) (internal quotation marks omitted); *see also United States v. Fennell*, 53 F.3d 1296, 1303–04 (D.C. Cir. 1995) (same). We do not reflexively remand. Rather, we interrogate the trial record according to *Strickland*'s familiar two prongs, remanding for an evidentiary hearing if the record is anything less than conclusive on a relevant matter of fact. Here, both sides claim the record is conclusive in their favor and, in the alternative, call for a remand.

We begin with the threshold legal question of whether the delay between Harris's indictment and trial violated the Speedy Trial Act at all, for it is difficult to see how counsel could be deficient for failing to protect speedy trial rights that were never infringed, and very difficult to see how a defendant could be prejudiced by the omission of a meritless motion. Harris was indicted on March 30, 2004; his trial began on October 13. Between those two dates, there is no dispute that pending motions tolled the Speedy Trial Act clock from May 10 through August 5 (when the court held a hearing and disposed of some motions) and September 30 through October 13 (when trial began). *See* 18 U.S.C. § 3161(h)(1)(F) (excluding "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion"). This leaves ninety-six days either untolled or disputed.[1] The dispute centers on a document the

---

[1] This circuit has spoken decisively to the issue of whether to exclude the particular day on which an indictment or pretrial motion is filed. *United States v. Fonseca*, 435 F.3d 369, 371–73 (D.C. Cir. 2006). The seventy-day clock starts ticking "the day *after* the filing date of an indictment," *id*. at 373 (emphasis in original), because the statutory language requires trial "*within* seventy days from the filing *date,*" 18 U.S.C. § 3161(c)(1) (emphasis added). In contrast, the exclusionary period begins "*on* the date of the filing of a pretrial motion," *Fonseca*, 435 F.3d at 373 (emphasis in original), because the statutory language tolls the clock "*from* the filing of the motion," 18 U.S.C. § 3161(h)(1)(F) (emphasis added). It is but a short step to add that the particular date on which the hearing is held is also part of the exclusionary period, since the statute excludes the whole period "from the filing of the motion *through the conclusion* of the hearing on, or other prompt disposition of, such motion." *Id.* (emphasis added). Finally, a logical consequence of not counting the date of indictment toward the seventy-day total is that we must count the date of trial, as *Fonseca* assumes, 435 F.3d at 372, and Federal Rule of Criminal Procedure 45(a)(3) indicates. In the instant case, then, we do not

government filed on May 10, entitled "Government's Notice of Intent To Impeach Defendant [Harris] with His Prior Convictions Pursuant to Fed. R. Evid. 609."

The first issue is whether to regard this document as itself a pretrial motion tolling the speedy trial clock. This is easily resolved: Federal Rule of Criminal Procedure 12(b) (along with Rule 47) governs pretrial motions. Rule 12(b)(4)(A) creates a category fitted out for the document at issue here: "[T]he government may notify the defendant of its intent to use specified evidence at trial in order to afford the defendant an opportunity to object before trial under Rule 12(b)(3)(C)." Rule 12(b)(3)(C) concerns "motion[s] to suppress evidence." Thus the government's notice was not a motion, but Harris's response "request[ing] that the Court preclude the admission of the above mentioned evidence at trial" was one, and it tolled the clock (or would have, were the clock not already tolled) from the date of its filing on May 12. *See also Melendez v. United States*, 518 U.S. 120, 126 (1996) ("[T]he term 'motion' generally means '[a]n application made to a court or judge for purpose of obtaining a rule or order directing some act to be done in favor of the applicant.'" (second alteration in original) (quoting BLACK'S LAW DICTIONARY 1013 (6th ed. 1990))).

The more difficult question is when the clock started ticking again. At the August 5 hearing, which the court had scheduled at the outset (and then rescheduled) to hear pretrial motions, the district judge took up the Rule 609 issue and expressly stated his intention to rule on it. But the motion was lost in the shuffle that day and, since Harris did not take the stand, never revisited. The

---

count March 30 (the date of indictment), May 10 (the date on which Harris filed a pretrial motion), August 5 (the date of the court's motions hearing), or September 30 (the date on which Harris filed another pretrial motion), while we do count October 13 (the date on which trial began), toward the seventy-day total.

government thus characterizes the unresolved motion after the hearing as "under advisement," which alludes to another exclusion on the Speedy Trial Act's list, this one for "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court." 18 U.S.C. § 3161(h)(1)(J). In effect, the government reads subsections (F) and (J) together such that, when pretrial motions are filed and a hearing on them held, a first period from filing to hearing is excluded under (F), and then a second period extending not longer than thirty days from the conclusion of the hearing to the resolution of the motions is excluded under (J).[2] Harris counters that the excludable period for a pretrial motion ends simply "with the conclusion of the hearing," but in this the government is surely correct. *United States v. Saro*, 24 F.3d 283, 292 (D.C. Cir. 1994) ("Once the hearing has been held . . . the statute also calls for the exclusion of a period 'not to exceed thirty days' during which the court actually holds the motion under advisement."); *United States v. Wilson*, 835 F.2d 1440, 1442 (D.C. Cir. 1987)

---

[2] If the district court requests additional material after the hearing, such as supplemental briefs, a third excludable period is added under subsection (F). *Henderson v. United States*, 476 U.S. 321, 331 (1986) ("[S]ubsection (F) excludes time after a hearing has been held where a district court awaits additional filings from the parties that are needed for proper disposition of the motion."); *United States v. Sutter*, 340 F.3d 1022, 1030 (9th Cir. 2003) ("[T]hree distinct categories of time are excludable: (1) the time from the filing of the motion to the hearing (whether or not such time was reasonably necessary); (2) additional time required to receive supplemental briefing or additional factual materials; and (3) an additional 30 days during which the matter is 'under advisement.'"). On the whole, "[t]he provisions of the Act are designed to exclude all time that is consumed in placing the trial court in a position to dispose of a motion," *Henderson*, 476 U.S. at 331, together with thirty days afterwards for the district court to consider and act on the matter.

("The two subsections [(F) and (J)] taken together thus exclude the time between the filing of a motion and the date it is taken under advisement by the court, plus the time during which the court holds the motion under advisement (up to 30 days)."); *see also United States v. Sutter*, 340 F.3d 1022, 1030 (9th Cir. 2003) (same); *United States v. Scott*, 270 F.3d 30, 55 (1st Cir. 2001) (same); *United States v. Davenport*, 935 F.2d 1223, 1228 (11th Cir. 1991) (same); *United States v. Mentz*, 840 F.2d 315, 326 (6th Cir. 1988) (same).

So Harris retreats to an alternative argument, capitalizing on the Supreme Court's reading of subsection (F): "Subsection (F), written in the disjunctive, excludes time in two situations. The first arises when a pretrial motion requires a hearing . . . . The second situation concerns motions that require no hearing and that result in a prompt disposition" pursuant to the thirty-day time limit in subsection (J). *Henderson v. United States*, 476 U.S. 321, 329 (1986) (internal quotation marks omitted). According to Harris, the Rule 609 dispute did not require a hearing, so the clock started ticking from the date the court was briefed (May 12) and ran out thirty days later—long before the August 5 hearing. But where a district court chooses to address a motion at a hearing, there is no precedent for finding the hearing un-required for purposes of *Henderson* or subsection (F), and some precedent to the contrary. *See, e.g.*, *United States v. Stafford*, 697 F.2d 1368, 1373 (11th Cir. 1983) ("*If a hearing is held*, (F) by its terms excludes without qualification the entire period between the filing of the motion and the conclusion of the hearing." (emphasis added)). More often the situation is one in which the district court did *not* hold a hearing, or did not hold one for many months, and the question is whether to toll the clock under (F) or under (J). *See, e.g.*, *United States v. Bush*, 404 F.3d 263, 273–74 (4th Cir. 2005). In any case, given the substance of the government's notice and Harris's response, the issue here was whether the probative value of Harris's conviction for felony escape was substantially outweighed by the

dangers of unfair prejudice. This is obviously a matter on which a district court might want some facts, and require a hearing.

Thus we subtract, pursuant to 18 U.S.C. § 3161(h)(1)(J), thirty days after August 5 from Harris's ninety-six-day total. The sixty-six remaining are within the Speedy Trial Act's seventy-day limit. With no Speedy Trial Act violation, Harris can make no case for ineffective assistance of counsel.

## II

We turn now to Antonio Roundtree's claim that the district court improperly limited the testimony of three witnesses in his favor: his mother, his girlfriend (and son's mother), and a co-worker, Lawrence Winters, from a charitable organization at which Roundtree volunteered. Roundtree did not call a fourth witness, this one an acquaintance from a fatherhood program, because the court's sharp oversight made the testimony, in Roundtree's judgment, "futile." Appellants' Br. 43.

Roundtree's mother took the stand first. Counsel first asked her whether she saw her son on the night of his arrest ("We talked in the kitchen.") and whether he had a job ("He's a move technician."). Trial Tr. 28–29, Oct. 14, 2004. When counsel asked, "Does Antonio have a family? . . . Describe his family for us," the government objected, and both parties approached the bench:

> THE COURT: You can make that objection right out in front of everybody. It's irrelevant. . . . [A]re you going to put his character in issue?
>
> [COUNSEL]: Yes. Squarely.
>
> THE COURT: Well, the question is did he or did he not deal the drugs, period. It's irrelevant.

*Id.* at 30. Counsel then quickly brought the examination to a close.

Roundtree's girlfriend testified next. Counsel asked her to "[t]ell us about [the] day" on which Roundtree was arrested, *id.* at 33, and the court immediately initiated a bench conference:

> THE COURT: Is she a witness, an eyewitness to anything that happened that night?
>
> [COUNSEL]: She dropped him off. In other words, Antonio keeps their child, he kept their child that day all day, and then they went to her house for the evening for dinner. . . .
>
> THE COURT: What does that have to do with this case? This is another way of putting on the evidence that he's a good father and takes care of his child and all that. That's irrelevant. . . . The evidence may refer to character for truthfulness or untruthfulness.
>
> [COUNSEL]: And I'm getting there.
>
> THE COURT: No, you're not going to get there. . . . When and if he testifies and when and if his credibility is attacked, and when you can make a proffer that her testimony will go directly to his character for truthfulness, then you can put this witness on. But this business of showing that he's a devoted husband and father, forget it.
>
> [COUNSEL]: Well, can she at least establish she dropped him off at a certain time?
>
> THE COURT: No. That's irrelevant.
>
> [COUNSEL]: He didn't have any drugs on him at the time that she dropped him off.

> THE COURT: How does she know that? . . . I'll let you save enough face by getting her off the stand to testify what time she dropped him off, period. That's it.

*Id*. at 33–35. Again, the questioning came quickly to a close.

Lawrence Winters took the stand after Roundtree himself had testified to his innocence ("I was talking to [friends] . . . [a]nd . . . police just came up," *id.* at 41) and had his credibility challenged on cross-examination ("Now I'm confused, because you just said you didn't see [Harris] that night," *id.* at 54). The court twice interrupted Winters's testimony. When counsel asked if Winters had been able to "form an opinion with regards to [Roundtree's] truthfulness," the court interjected: "Now, wait a minute, Counsel. We're talking reputation testimony." *Id*. at 65. When counsel asked about Roundtree's reputation for truthfulness, the Court asked: "In what community? Among what people? I need a better foundation than that, Counsel. This is a very narrow question." *Id*. at 66. Ultimately the witness testified that Roundtree is known for truthfulness "[a]mongst the people that [he] interacts with." *Id.* The witness left the stand moments later, and Roundtree rested without calling the second character witness he had scheduled.

Roundtree makes three arguments on appeal. First, he claims the court wrongfully limited testimony from his mother and girlfriend geared to showing he had no drugs on the night in question and lacked the demeanor of a man about to deal drugs. Second, he claims the court prevented him from presenting testimony from all three witnesses (and the fourth he would have called but for the sharpness of the court's oversight) that would have demonstrated his truthful character. And third, he makes the same claim for all his witnesses with respect to a second character trait, one he did not mention at trial but mentions on appeal: law-abidingness. The latter two arguments concern the district court's exclusion of character evidence; we review for

abuse of discretion. *In re Sealed Case*, 352 F.3d 409, 411 (D.C. Cir. 2003) ("This court reviews a district court's exclusion of character evidence for abuse of discretion."); *see also Michelson v. United States*, 335 U.S. 469, 480 (1948) (Jackson, J.) ("Both propriety and abuse of . . . reputation testimony . . . depend on numerous and subtle considerations difficult to detect or appraise from a cold record, and therefore rarely and only on clear showing of prejudicial abuse of discretion will Courts of Appeals disturb rulings of trial courts on this subject."). The first argument concerns mixed issues of character evidence, relevancy, and the probity/prejudice balance; again, we review for abuse of discretion. *United States v. Fonseca*, 435 F.3d 369, 373 (D.C. Cir. 2006) (stating that we generally review a district court's evidentiary rulings for abuse of discretion); *United States v. West*, 393 F.3d 1302, 1309 (D.C. Cir. 2005) (applying abuse of discretion standard to district court's relevancy determination under Federal Rule of Evidence 401); *United States v. Gartmon*, 146 F.3d 1015, 1020 (D.C. Cir. 1998) (applying abuse of discretion standard to district court's probity-versus-prejudice determinations under Federal Rule of Evidence 403). Although Roundtree ultimately bases his arguments on a criminal defendant's right to compulsory process for obtaining witnesses in his favor, U.S. CONST. amend. VI; *Washington v. Texas*, 388 U.S. 14 (1967) (identifying compulsory process right as fundamental and incorporating it into the Fourteenth Amendment's Due Process Clause), he does not claim that the district court's conduct, if consistent with the Federal Rules of Evidence, might still violate his constitutional rights. We thus confine our analysis to the Rules.

The district court's toughest evidentiary rulings, those against the mother and girlfriend, show one persistent aim: to prevent testimony whose purpose was, in the court's judgment, purely or mainly to cast Roundtree in the sympathetic light of a dedicated family man who spent the evening before his criminal adventure talking with his mother, playing with his son, and

caring for his girlfriend. This evidentiary position is unassailable; it is familiar ground that while a criminal defendant can put character in issue, the evidence can concern only a "pertinent trait of character," FED. R. EVID. 404(a)(1), and even then may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice," FED. R. EVID. 403. *United States v. Guardia*, 135 F.3d 1326, 1331 (10th Cir. 1998) ("Furthermore, courts apply Rule 403 in undiluted form to Rules 404(a)(1)-(3) . . . ."); *see also United States v. Angelini*, 678 F.2d 380, 381 (1st Cir. 1982) ("The word 'pertinent' is read as synonymous with 'relevant.'"); *United States v. Hewitt*, 634 F.2d 277, 279 (5th Cir. 1981) (same); 22 CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 5236 (1978) (same). *But see United States v. Han*, 230 F.3d 560, 564 (2d Cir. 2000) ("Federal R. Evid. 404(a)(1) applies a lower threshold of relevancy to character evidence than that applicable to other evidence."). Thus Roundtree studiously avoids defending the admissibility of evidence related to his family, arguing instead that when counsel asked Roundtree's mother to "[d]escribe his family for us," and his girlfriend to "[t]ell us about [the] day" on which he "kept their child" until they "went to her house for the evening for dinner," he was only seeking testimony about Roundtree's demeanor and circumstantial evidence of whether Roundtree was carrying drugs. One can understand the district court's suspicions. But let us take Roundtree's stated goal for the testimony at face value for the moment. What exactly is the demeanor of a man about to deal drugs? Furtive? Drug-dealing is not the most hot-blooded of crimes, particularly when the dealing is as orderly and routinized as "a drive-through." Trial Tr. 79, Oct. 13, 2004. And as to the girlfriend's testimony about whether Roundtree had drugs when she dropped him off, even setting aside the court's sensible question ("How does she know that?"), the government never suggested that Roundtree brought the drugs to the scene. Quite the opposite: The government

presented Roundtree as a runner for a bagman who got away. In these circumstances, even if the district court had believed Roundtree was seeking to air relevant demeanor and circumstantial evidence rather than prohibited forms of character evidence (something the court was not obligated to believe), the court was nonetheless free to find the evidence excessively prejudicial. We find no abuse of discretion on these matters.

Turning to Roundtree's second argument, his attempt to demonstrate truthful character, the point is simply a nonstarter with respect to his mother's and girlfriend's testimony. Rule 608(a) of the Federal Rules of Evidence states: "[E]vidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked . . . ." Roundtree had at that time not yet taken the stand—and indeed, the court told Roundtree's counsel: "When and if . . . his credibility is attacked . . . you can make a proffer that her testimony will go directly to his character for truthfulness . . . ." As to Winters, the court *permitted* his testimony to Roundtree's truthfulness, and at a bench conference had pre-approved the same testimony from the uncalled fourth witness. (When Winters testified, the court appears to have interjected to clarify whether he was giving opinion or reputation testimony, but the court did not indicate it was excluding either and in fact had pre-approved both at the bench conference.) Thus Roundtree's only option is to argue that Winters's reputation testimony was inadequate because he was not "permitted to offer testimony regarding the specifics of his interaction with Roundtree." Appellants' Br. 43. But of course a witness's credibility may not be defended on the basis of specific acts of conduct. FED. R. EVID. 608(b). The district court's rulings on these matters were not abuses of discretion; indeed, they may have been nondiscretionary.

Roundtree claims the excluded testimony of all three witnesses, plus the uncalled fourth witness, would have demon-strated his character for law-abidingness. The district court

twice indicated second thoughts on his own rulings in this regard.  At a hearing after the close of all evidence but before closing arguments, the court said:  "I may have called that game a little close on the defense . . . .  There is a place for opinion testimony on general character of law abidingness, of course, but I did not understand, nor was any proffer made to me that that's what was coming down."  Trial Tr. 83–84, Oct. 14, 2004.  This is certainly true; there is no indication in the trial record of Roundtree's counsel ever mentioning the character trait of law-abidingness.  "And the other information about the defendant, just to paint him as a good son, father, caretaker, and so forth," the court explained, "not only dealt with a trait of character that is not relevant to the crime involved in this case, but even if it were, I would have excluded it on 403 grounds."  *Id.* at 84.  The court then invited Roundtree's counsel to speak in order to "make your own record" on the issue.  *Id.*  At a status hearing four months later, the court returned to the theme:  "On a review of the record, I think it is pretty clear that I did erroneously limit the defendant's ability to call a reputation witness; that is, a character witness for the defendant's reputation for lawfulness in the community.  However, at a later point in the record I did what I could to redress that situation," by permitting Roundtree's counsel "to respond or to make his own record."  Tr. Status Hr'g 4, Feb. 16, 2005.  The court concluded:  "And I suppose we're going to have to leave it to the Court of Appeals to parse the exact words that were said . . . but I still don't see, reading the record, that [Roundtree's counsel] ever proffered actual character testimony on the defendant's character as a law-abiding citizen."  *Id.*

Roundtree now seeks to treat these statements from the district court as admissions of error analogous to an opposing party's concessions, closing off analysis on appeal and shifting this court to the position of examining admitted error for harmlessness.  But a party's concession wipes away a dispute and with it, in most cases, our purpose in hearing an issue.  A

district court's second thoughts do not make an issue disappear. And in any case, our purpose is to evaluate the evidentiary rulings themselves, not the court's later remarks about them. We cannot find fault with those rulings. Actually, the trial judge may have been a little hard on himself. He suggested the appellate court would have "to parse the exact words that were said." We have done so. Roundtree indeed made no proffer concerning his character for law-abidingness; at trial, the only character trait he mentioned to the court was truthfulness. There is thus no erroneous ruling to complain of, and it is not clear what the district court could have done differently.

### III

The jury began deliberating on Thursday afternoon. Shortly before close of business on Friday, the judge received a note from the foreman: "Can we be excused for the day? Juror 6 needs to leave to pick up her daughter. We are <u>not</u> unanimous!" (emphasis in original). As the judge later explained:

> I went into the jury room, as is my practice, to release the jury. . . . I told them that they could go home, of course, and I complimented them on their hard work, and tried to say nothing else.
>
> But the jury wanted to talk a little bit. I was reluctant, of course, to talk to them at all except to tell them that they could go home. But they began to say things like: "[A]t what point do we—what do we do if we can't decide?" And I said, "Well, I can't really talk to you about a subject like that without the attorneys being present." "Well," they said, "maybe we need some more instruction." And I said, "Well, have a nice weekend. We'll talk about it on Monday morning."

Trial Tr. 2–3, Oct. 18, 2004. Immediately afterwards, the judge sent counsel an email stating he wished to speak to the jury Monday morning and asking counsel to attend. That day, before the jury filed in, the judge reported to counsel his interaction with the jury on Friday (as quoted above), stated his intention to read to the jury the anti-deadlock instruction recommended by the Council for Court Excellence, and stated his intention to re-read the instruction inviting a verdict as to just one of the two defendants, if they were unable to reach a verdict on both. He invited objections, but almost immediately after that discussion began (with a question from the government), he received a note from the jury stating that it had a unanimous verdict. About half an hour into the morning, the jury pronounced both defendants guilty.

Harris and Roundtree claim the judge's *ex parte* conversation with the jurors while they were deliberating constitutes reversible error under both the statutory and constitutional dimensions of Federal Rule of Criminal Procedure 43(a)(2): "Unless this rule . . . provides otherwise, the defendant must be present at . . . every trial stage . . . ." *See United States v. Gordon*, 829 F.2d 119, 123 (D.C. Cir. 1987) ("As [a restatement of existing law], Rule 43 embodies the protections afforded by the sixth amendment confrontation clause, the due process guarantee of the fifth and fourteenth amendments, and the common law right of presence."). Defendants' argument has three steps. First, they argue that any *ex parte* contact between a judge and a deliberating jury constitutes error. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 460–62 (1978) (observing the "hazards of *ex parte* communications with a deliberating jury" and finding the practice "pregnant with possibilities for error"); *Rogers v. United States*, 422 U.S. 35, 39–41 (1975) (holding a trial judge's *ex parte* response to a jury's question to violate Rule 43); *United States v. Yarborough*, 400 F.3d 17, 20 (D.C. Cir. 2005) (finding *ex parte* communications between the judge and deliberating jury "fraught with the

potential for jury coercion"); *Walker v. United States*, 322 F.2d 434, 435 (D.C. Cir. 1963) ("[Rule 43] prohibits the judge from communicating with the jury in any way, either before or after it has begun to deliberate, when the defendant is absent."). Second, they argue that where a jury is both deliberating and deadlocked, a judge's *ex parte* communications are presumptively prejudicial. *See United States v. Mejia*, 356 F.3d 470 (2d Cir. 2004) (vacating a conviction because the district court's implicit direction to "continue deliberations" despite deadlock, delivered *ex parte*, plausibly "induced unanimity" (internal quotation marks omitted)); *see also United States v. Thomas*, 449 F.2d 1177, 1182–84 (D.C. Cir. 1971) (en banc) (reversing a district court for insisting that a jury keep deliberating, thus potentially "prying individual jurors loose from beliefs they honestly have"). They add that where the government's evidence of guilt is "'conflicting or ambiguous,'" as they claim it was here, "'the danger that an error will affect the jury's verdict is almost always substantial.'" *United States v. Cunningham*, 145 F.3d 1385, 1396 (D.C. Cir. 1998) (emphasis omitted) (quoting *United States v. Smart*, 98 F.3d 1379, 1392 (D.C. Cir. 1996)); *see also Thomas*, 449 F.3d at 1183. They also add that where a jury returns its verdict soon after a judge's *ex parte* communication, there is reason to suspect the communication "induced unanimity." *Rogers*, 422 U.S. at 40; *Mejia*, 350 F.3d at 477. Having engineered this hair-trigger standard for prejudice, it remains only for defendants to interpret the trial judge in the instant case as stepping over the line. Thus, third, they characterize the judge's Friday afternoon remarks as implicitly charging the jury to keep deliberating, and then characterize the jury's verdict on Monday morning—coming "after just 28 minutes of additional deliberation" (not to mention two-and-a-half weekend days apart)—as the effect of that coercion. Appellants' Reply Br. 11.

This is a sophisticated argument, but it must contend with the plain fact that when the jury asked to talk about the case

outside the presence of counsel, the judge politely but utterly refused to do so. Presumptions may not entirely substitute for facts. We need not decide whether the *ex parte* contact was error.[3] The question is whether such a minimal and constrained degree of contact could fail harmless error review.

The precedents defendants cite do not alter the manner of that review. In fact, those precedents largely concern an issue foreign to the instant case: the issue of how a judge may instruct a deadlocked jury. On the one hand, trial judges may encourage deadlocked jurors to reconsider their positions, *Allen v. United States*, 164 U.S. 492, 501–02 (1896); on the other hand, trial judges may not coerce a verdict, *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988). "This tension," *Yarborough* explains, "became the subject of countless criminal appeals." 400 F.3d at 21. We sought to stem the tide by approving a standardized instruction in *Thomas*, 449 F.2d at 1187, and we insisted on that standardized instruction in *Yarborough*, reversing a trial judge for instructing a deadlocked jury with the Council for Court Excellence's somewhat stronger anti-deadlock charge, 400 F.3d at 21–22. But the trial judge in the instant case did not deliver the Council for Court Excellence charge or any other deadlock instruction.[4]

---

[3] We would, however, caution the district court against *ex parte* contact with a deliberating jury in the future, even if the contact is intended merely to show gratitude for the jurors' hard work or wish them a good evening. Precedents like *U.S. Gypsum*, *Rogers*, *Yarborough*, and *Walker* show that such communications are too perilous for even the most conscientious judge to venture.

[4] It must be said that the judge in the instant case came perilously close to delivering the Council for Court Excellence charge, stating his intention to do so just before getting the jury's verdict note, which would have made this a very different case.

The best defendants can argue, then, is that what the judge did say—"I can't really talk to you about a subject like that without the attorneys being present," and "We'll talk about it on Monday morning"—amounted to an implicit but nonetheless coercive message to reach unanimity contrary to the spirit of the *Thomas-Yarborough* line of cases. As Harris's counsel acknowledged at oral argument, "What my case does depend on is that you find that in sum and substance the judge instructed the jury to continue its deliberations here." Defendants are somewhat aided in this argument by *United States v. Mejia*, in which the Second Circuit reversed a trial court for "its failure to respond to the report of deadlock," which "in effect directed the jury to continue deliberations . . . [and] may have induced unanimity." 356 F.3d 470, 477 (2d Cir. 2004) (internal quotation marks omitted). But the *Mejia* jury had been deadlocked for three days, repeatedly sent deadlock notes to the judge, and already received supplementary instruction encouraging unanimity. Finally, it sent a note stating: "We the Jury *can't* come to an agreement—we have exhausted all possibilities & have had the same vote for the past 2½ full days 11–1." *Id.* at 473 (emphasis in original). The court responded with a rebuke for reporting the 11–1 division, and a unanimous verdict came back a few minutes later. Even were it authoritative within our circuit, these facts are much more extreme than those in the instant case. Indeed, it is not at all clear that the jury in our case *was* deadlocked. The record makes clear the jurors hadn't arrived at unanimity as of Friday afternoon; that is all. Precedents about how to instruct a deadlocked jury do not control where the jury was neither deadlocked nor instructed as to deadlock.

We therefore scrutinize the trial judge's *ex parte* contact with the deliberating jury in the usual way, to determine harmlessness or prejudice. *See id.* at 476 ("It is well settled, however, that an ex parte communication by a judge to a jury in response to a jury inquiry may be considered harmless error

where the communication cannot be said to have prejudiced the defendant."). We apply the *Kotteakos* standard for testing harmlessness, evaluating whether it is "highly probable that the error had substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. United States*, 328 U.S. 750, 776 (1946).[5] What is the injurious influence here? Defendants offer only the suggestion already discussed, that the judge's remark, "We'll talk about it on Monday morning," threatened the jurors with indefinite deliberation until unanimity. The suggestion would be at least a little more plausible if the judge had said, "We'll talk about it next Friday." Monday was the next working day after an early dismissal on Friday afternoon. Had the judge resolved at the moment he walked into the jury room to declare a hung jury and a mistrial at the first opportunity, he would have said the same.

---

[5] We normally apply *Kotteakos* where trial errors do not implicate constitutional rights and the more stringent *Chapman v. California* standard, 386 U.S. 18, 24 (1967) (requiring the government to prove harmlessness beyond a reasonable doubt), where they do. *United States v. Lane*, 474 U.S. 438, 460–61 (1986). Rule 43, as noted above, is a peculiar hybrid, codifying rights with origins in the Fifth and Fourteenth Amendments' Due Process Clauses, the Sixth Amendment's Confrontation Clause, and the common law right of presence. *United States v. Gordon*, 829 F.2d 119, 123 (D.C. Cir. 1987); *United States v. Brown*, 571 F.2d 980, 986–87 & n.5 (6th Cir. 1978); *see also United States v. Gagnon*, 470 U.S. 522, 526 (1985). Although defendants assert that the trial judge's error implicated their due process rights, we see no due process violation according to the standard Justice Cardozo promulgated in *Snyder v. Massachusetts*, 291 U.S. 97, 107–08 (1934): "[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *See also Gagnon*, 470 U.S. at 526–27 (finding no due process violation for brief and nonsubstantive *ex parte* contact between judge and jurors).

IV

Harris and Roundtree join in a final argument, this one cast as a sufficiency of the evidence claim and aimed at their conviction under 21 U.S.C. § 841(b)(1)(B)(iii), giving a five-year minimum for possessing with intent to distribute the *quantity* of five grams or more of cocaine base. Drug dealing operations often employ "runners," who don't control the stash, and "holders," who do; the runners help secure customers for the holders. *United States v. Monroe*, 990 F.2d 1370, 1372 (D.C. Cir. 1993). Harris and Roundtree were runners. The evidence at trial gave no indication that they ever personally controlled the plastic bag filled with 37.6 grams of crack cocaine, or even carried as much as five grams back and forth to the waiting cars. The government proceeded on an aiding and abetting theory under 18 U.S.C. § 2 (holding aiders and abettors punishable as principals under federal criminal law), and defendants argue the evidence was insufficient to show they aided and abetted in possessing "*more than five grams* of cocaine base," Appellants' Br. 44 (emphasis in original). *See also United States v. Lam Kwong-Wah*, 924 F.2d 298, 302 (D.C. Cir. 1991) ("[A]n indictment need not specifically include an aiding and abetting charge because, whether specified or not, the federal statute creating liability for aiding and abetting is considered embodied in full in *every* federal indictment." (internal citation and quotation marks omitted)). We review sufficiency of the evidence claims on a "demanding" standard, *id.*, investigating "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

There is law exactly on point in our circuit. In *United States v. Monroe*, a woman (Monroe herself) sold an undercover officer 0.41 grams of crack. The officer asked how he could get

more. "I only have this one," she said, "but you can get one from my buddy," who was sitting beside her and had 13 grams of crack. 990 F.2d at 1372. Monroe was convicted, on an aiding and abetting theory, of possession with intent to distribute all 13 grams. This circuit ruled against her sufficiency of the evidence appeal, stating that under 18 U.S.C. § 2: "It is enough for the Government to establish Monroe's involvement in the general scheme, thereby assisting or encouraging [her friend's] possession of the drugs with intent to distribute them. The evidence is sufficient to support Monroe's conviction if the Government proves that Monroe acted as a middleman—procuring the customers and maintaining the market in which the possession is profitable." 990 F.2d at 1374 (internal quotation marks omitted); *accord Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949) (finding sufficient evidence for conviction as an aider and abettor where a defendant "'in some sort associate[s] himself with the venture . . . participate[s] in it as in something that he wishes to bring about . . . seek[s] by his action to make it succeed'" (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (L. Hand, J.))); *United States v. Poston*, 902 F.2d 90, 94 (D.C. Cir. 1990) (finding sufficient evidence for conviction as an aider and abettor where a narcotics defendant lacked actual or constructive possession of the drugs and served only as a lookout); *United States v. Raper*, 676 F.2d 841, 848–52 (D.C. Cir. 1982) (finding sufficient evidence for conviction as an aider and abettor where a narcotics defendant acted as a runner for a bagman, collecting money but never directly handling drugs).

Harris and Roundtree attempt to argue their position under *Monroe*, interpreting the case to require that they "encourage[] the bag man not simply to possess contraband, but rather to possess *more than five grams* of contraband by creating an environment in which possession *of that amount* was profitable." Appellants' Reply Br. 23 (emphasis in original). But here, as in *Monroe*, a rational jury could find that the joint

venture aimed, and defendants aimed, to distribute the entire stash.  *See Raper*, 676 F.2d at 849 ("What is required on the part of the aider is sufficient knowledge and participation to indicate that he knowingly and willfully participated in the offense in a manner that indicated he intended to make it succeed."). Defendants can do little else but urge us to abandon *Monroe*, claiming it is inconsistent with the text of 18 U.S.C. § 2 and *Nye & Nissen*.  But even if this panel had authority to overturn *Monroe*, the case is plainly a faithful if expansive interpretation of § 2's laconic text, as was *Nye & Nissen* itself.


∗ ∗ ∗


The judgment of the district court is therefore

*Affirmed.*

WILLIAMS, *Senior Circuit Judge*, dissenting in part: Although I don't think the court is necessarily wrong in its analysis of the Speedy Trial Act issue, I think the decision is at least questionable—and in the end avoidable because, even if there was a violation, trial counsel's failure to raise the issue probably didn't demonstrate ineffective assistance of counsel within the meaning of *Strickland v. Washington*, 466 U.S. 668 (1984). Accordingly, I think a remand to the trial court would be the better course.

\* \* \*

The relevant facts are these: On May 10 the government gave notice of its intent to impeach Harris with his prior convictions, and Harris responded on May 12 by filing a motion asking the court to exclude any such evidence. The government filed no opposing papers. There the matters languished until August 5, when the court held a hearing to wrap up pending motions, namely, Harris's requests for suppression and for exclusion of the Rule 609 evidence. At that time both Harris and the government made clear that as to the Rule 609 motion they intended to file no further papers, and sought neither argument nor an evidentiary hearing. The court on August 5 denied the suppression motion, but no one said anything on the merits of Harris's effort to exclude the prior convictions. We may infer that at that point the Rule 609 motion was taken "under advisement," a critical condition under the Act, *if it wasn't already under advisement*.

According to the majority, the Act directs exclusion of the entire time from May 12, 2004 (when the defendant filed his motion in response to the government's Rule 609 notice) until 30 days after August 5, the date of the omnibus hearing on pending pre-trial motions.

The relevant provisions of the Act are exclusions under subsections (F) and (J) of 18 U.S.C. § 3161(h)(1). Subsection (F) excludes

> delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion.

*Id.* § 3161(h)(1)(F). Subsection (J) excludes

> delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court.

*Id.* § 3161(h)(1)(J). Because Harris makes no real objection to the exclusion of the period from May 12 to August 5, the only question is how much time thereafter, if any, can be excluded on the basis of the Rule 609 motion. That in turn depends on whether the motion came "under advisement" by the court on August 5 or sooner.

To be clear, my disagreement with the majority concerns only the treatment of the Rule 609 motion. The question is when that motion came under advisement. If that happened only on August 5, as the court says, another 30 days are excluded pursuant to subsection (J); if it came under advisement before August 5, then the 30 days afforded by subsection (J) started running before August 5. Depending on when that moment was, some or all of the 30 days available for the Rule 609 motion under subsection (J) may have run concurrently with the days concededly excluded between May 10 and August 5.

The Supreme Court in *Henderson v. United States*, 476 U.S. 321 (1986), held that subsection (F) announces a general rule of exclusion, irrespective of the reasonableness of the delay, subject to the limit imposed by subsection (J). See *id.*

at 326–29.  According to the Court, only 30 additional days can be excluded under subsection (J) once a "district court has a motion 'under advisement,' *i.e.*, 30 days from the time the court receives all the papers it reasonably expects." *Id*. at 329. *Henderson* goes on to depict two possible scenarios, one where a motion "requires a hearing," and the other where it does not.  *Id*.  (*Henderson* doesn't say whether these two exhaust the possibilities.)   As to the first, subsection (F) excludes all of the time from the filing of the motion until the hearing, and subsection (J) excludes up to 30 days thereafter. As to the second, where no hearing is required, subsection (J) is triggered at the point where "the court receives all the papers it reasonably expects."  *Id*.  By this the *Henderson* Court likely meant the period allowed under court rules for responses and replies, see *id*. at 328, subject to a trial court's case-specific adjustments.

The court finds subsections (F) and (J) fully applicable by describing the trial court as having chosen "to address [the Rule 609] motion at a hearing," i.e., the August 5 event. Majority Op. at 8.  On that view the majority excludes the entire time from May 12 to August 5 under subsection (F) (a matter not very important in itself because of the defendant's concession), *plus* 30 days after August 5 under subsection (J). A proceeding in which evidence is taken, or the merits of a motion are argued, qualifies as a "hearing" that triggers subsection (J), i.e., the moment of a motion's coming "under advisement," but it seems to me questionable to give that effect to a proceeding that features no substantive colloquy on the motion whatever, and occurs long after the filing of papers has drawn to a close.  Why didn't the motion come "under advisement" at the point where the government's time to respond expired, which under D.D.C. Crim. R. 47(b) would appear to have occurred 11 days after Harris's May 12 motion?

There is a path by which one might arrive at the court's conclusion. *Henderson* divided the universe into motions requiring a hearing and ones requiring no hearing, but left unclear whether there might be other categories. What of motions for which the need for a hearing is uncertain at the time of filing, or at the time when all further filings are complete or time-barred? Assuming Harris's Rule 609 motion fell into that category until August 5, when it became clear that neither party felt any need for evidence, oral argument, or further papers, perhaps it was only at that moment that the court reasonably understood itself to have "receive[d] all the papers it reasonably expect[ed]," thus triggering subsection (J). A difficulty with this analysis is that it leaves unexplained why the mere possibility of a hearing should stop the clock. Or must the defendant flag the government's non-response in order to restart the clock? If the courts are to pursue this approach, they will have to invent all the subsidiary rules themselves, with no help from the Act.

Moreover, any such rationale for the court's result is at least in tension with the First Circuit's decision in *United States v. Scott*, 270 F.3d 30 (1st Cir. 2001). There the district court had scheduled a hearing for September 16, 1999, but the hearing didn't take place because of bad weather; the parties then made clear that they were content to submit their motions on the filings. Four months later, the district court called for supplemental briefing. *Id*. at 54. Although a literal reading of *Henderson* might yield the conclusion that the district court had not taken the motion "under advisement" on September 16 because the court had not "receive[d] all the papers it reasonably expect[ed]," *Henderson*, 476 U.S. at 329, the First Circuit decided that this limbo period could not be excluded:

> The [Act] makes no provision for what the district court did here: not decide the motion for 124 days and then retroactively seek to explain the lack of prompt

> disposition by saying it needed additional filings, although it had taken the matter under advisement earlier. Nor does the [Act] make any provision for a district court effectively to take a matter under advisement for decision, but then to avoid the [Act's] timeline by saying that matter was not under advisement within the meaning of the [Act]. We do not think the [Act] permits either course of action. Such an approach would undermine the purposes of the [Act].

*Scott*, 270 F.3d at 56. *Scott* is plainly distinguishable, to be sure. There everything suggested that the motion had come under advisement on September 16, whereas here the question of when the motion came under advisement is unresolved— though it is hard to see why it should have been later than the point where a government response was time-barred (evidently 11 days after Harris's May 12 motion). If subsection (J) was triggered well before August 5, as seems likely, the district court would still have been free to conduct a hearing. But under subsection (J) it would have had to reach that decision within 30 days after the matter came under advisement, or risk restarting the Speedy Trial Act clock.

There are, to be sure, many complex permutations. For example, as the paragraph above suggests, the court may take a motion under advisement but later determine that further briefing or argument is necessary. In such a situation, if the court called for the submissions within 30 days, the period up to that call would be excluded under subsection (J), the time allotted for submissions would be excluded under subsection (F) (because the motion would no longer be under advisement), and only then would the 30-day subsection (J) time limit begin to run again (starting at zero, or subtracting the time elapsed before the call for more submissions?). Also, as other circuits have noted, the 30-day limit of subsection (J) might not apply rigidly when multiple motions are pending

before a district court.  See *Scott*, 270 F.3d at 57 n.19; *United States v. Tibboel*, 753 F.2d 608, 611–12 (7th Cir. 1985).  Under *Tibboel* the multiplicity of motions might call for a period under advisement exceeding 30 days, so that a finding of no violation might be correct even if the Rule 609 motion came under advisement well before August 5.  A remand here could disclose details governing the application of this latter exception, if it proved necessary.

\* \* \*

Because of the uncertainty surrounding the alleged Speedy Trial Act violation, particularly the date on which the Rule 609 motion should be considered as having been taken "under advisement," I would remand the case so that the district court could resolve the issue in the most economical way.  The briefing suggests (though the trial court may know better) that this would be by first deciding whether, assuming there was a violation, Harris's attorney's conduct amounted to ineffective assistance under *Strickland*.  Then, if necessary, the court would decide whether there was a Speedy Trial Act violation, taking into account whatever might shed light on the effects of the parties' collective inactivity after May 12 with respect to the Rule 609 motion.